Martin DEUBELBEISS, Appellant,

v.

COMMERCIAL FISHERIES ENTRY
COMMISSION, Appellee.

No. 6494.

Supreme Court of Alaska.

Oct. 12, 1984.

Martin Friedman, Homer, for appellant.

Wilson L. Condon, Atty. Gen., and John B. Gaguine, Asst. Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINO-WITZ, MATTHEWS, COMPTON and MOORE, JJ.

OPINION

MOORE, Justice.

In this case an unsuccessful applicant for a limited entry permit challenges an administrative regulation specifying the number of points awarded for availability of alternative occupations. *See* 20 ACC 05.-630(b)(4). We hold that the regulation's method of ranking applicants for limited entry permits violates the equal protection rights guaranteed by the Alaska Constitution. We therefore reverse the superior court's decision.

## I.

Martin Deubelbeiss was a forty-year-old resident of Ninilchik, Alaska, when he applied for a Cook Inlet salmon drift gillnet fishing limited entry permit in 1975. Deubelbeiss had participated in the Cook Inlet fishery since 1964. He was awarded fifteen points under the point system of 20 AAC 05.630. Gear licenses were ultimately issued to persons with sixteen or more points.[1]

Deubelbeiss challenged the Commercial Fisheries Entry Commission's (CFEC) decision to award him only two points for the availability of alternative occupations. Points were awarded for the availability of alternative occupations based on an individual's domicile, under a schedule set forth in 20 AAC 05.630(b)(4). Under the regulation, the total population and the proportion of rural population in the census district or county of an applicant's domicile were the sole criteria for the award of points for availability of alternative occupations, except for persons lacking road access to other "potential areas of employment."[2]

Deubelbeiss sought a hearing before the CFEC to contest the validity of the regulation and to present alternative evidence of the lack of availability of alternative occupations for him.

The CFEC refused to grant him a hearing, since the facts relevant to an award of points under 20 AAC 05.630(b)(4) were not disputed, and the CFEC does not allow hearings for the purpose of contesting its regulations, except for questions of interpretation.

Deubelbeiss timely appealed to the superior court, which affirmed the CFEC's position in a memorandum decision. He appeals again.

## II.

Appellant asserts that the CFEC's alternative occupation point scheme, as set forth in 20 AAC 05.630(b)(4), is constitutionally infirm. He specifically argues that the wholesale use of census districts to allocate hardship points for the unavailability of alternative occupations violates his rights to equal protection of the law pursuant to Article I, Section 1 of the Constitution of the State of Alaska.

Article I, Section 1 of the Alaska Constitution states the principle that "all persons are equal and entitled to equal rights, opportunities, and protection under the law...." In *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), we first had occasion to apply an intensified rational basis test in an equal protection challenge to a section of Alaska's Limited Entry Act, AS 16.43.-010–.380. Recently, under the state's equal protection clause,

we have postulated a single sliding scale of review ranging from relaxed scrutiny to strict scrutiny. The applicable standard of review for a given case is to be determined by the importance of the individual rights asserted and by the degree of suspicion with which we view the resulting classification scheme.

---

1. For a description of the point system for allocation of limited entry permits, *see Rose v. Commercial Fisheries Entry Commission,* 647 P.2d 154, 155–57 (Alaska 1982).

2. 20 AAC 05.630(b)(4) states:

    (b) Economic Dependence. Up to a maximum of 20 points will be awarded an applicant for economic dependence on a fishery based on the following schedule:
    ....
    (4) availability of alternative occupations in applicant's place of domicile as of the qualification date. (Maximum of four points possible.)
    (A) domicile in a census district or county with a population that is more than 80% rural or has a total population of under 10,000 as of the 1970 census ... 4 points
    (B) domicile in a census district or county with a population that is more than 40% rural or has a total population of under 25,000 as of the 1970 census ... 2 points
    (C) domicile in a census district or county with a population that is 40% or less rural or has a total population of 25,000 or more as of the 1970 census ... 0 points
    (D) an applicant from a zero to two point area may receive up to the maximum of four points through a special showing that there is neither a road nor adequate daily transportation service from the applicant's domicile to other potential areas of employment in his census district.

*State v. Ostrosky*, 667 P.2d 1184, 1192–1193 (Alaska 1983), (footnote omitted).

■ Even in cases such as this, which do not involve fundamental rights or suspect classifications,[3] we minimally require

> that the legislation be based on a legitimate public purpose and that the classification 'be reasonable, not arbitrary, and ... rest upon some ground of difference having a fair and substantial relation to the object of the legislation....' *Isakson v. Rickey*, 550 P.2d at 362 (quoting *State v. Wylie*, 516 P.2d 142, 145 (Alaska 1973)).

*State v. Ostrosky*, 667 P.2d 1184, 1193 (Alaska 1983).

The purpose of the regulation before us, 20 AAC 05.630, is explicitly stated in the section of the Limited Entry Act which authorized its promulgation, AS 16.43.250.[4]

To avoid unjust discrimination[5], the Act instructed the commission to rank applicants for the limited number of permits according to the degree of hardship which they would suffer by exclusion from the fishery. *Isakson v. Rickey*, 550 P.2d at 363. The legislature determined that whether or not an applicant had occupations other than fishing available to him was an important factor in assessing his economic dependency on the fishery for the purpose of awarding a limited entry permit.

■ Appellant does not dispute the legitimacy of that purpose. Indeed, he agrees that the availability of alternative occupations is a useful and appropriate criterion. Therefore, the only question before us is whether the means of classification chosen by the commission to allocate points bears a fair and substantial relation to the purpose of the regulation.[6] Does the use of census districts bear a fair and substantial relation to the determination of the availability to an applicant of alternative occupations? In our opinion, it clearly does not.

■ 20 ACC 05.630(b)(4) employs census districts as the sole mechanism for determining the "availability of alternative occupations in [an] applicant's domicile." Appellant argues that such a classification mechanism simply bears no realistic correlation to whether a given applicant has alternative occupations available in his domicile. Appellee concedes that a census district is merely a federal population device for determining political representation. Further, the record provides no justification[7] for the commission's decision to utilize census districts.

Moreover, because persons such as appellant are automatically allocated fewer points for availability of alternative occupations because they happen to be located within one of the more populous census districts, in spite of their residence in a

---

**3.** We have previously determined that the right to a limited entry permit is not a fundamental right. *Isakson v. Rickey*, 550 P.2d 359, 363 (Alaska 1976). Further, we do not consider the regulatory classification before us to be suspect.

**4.** AS 16.43.250. Standards for initial issue of entry permits provides, in pertinent part:
(a) [T]he commission shall adopt regulations establishing *qualifications for ranking applicants* for entry permits *according to the degree of hardship which they would suffer by exclusion* from the fishery. The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the *following hardship standards:*
(1) degree of economic dependence upon the fishery, including but not limited to ... *availability of alternative occupations....*
(Emphasis added).

**5.** Appellant also argues that the regulation in question violates the explicit mandate of AS

16.43.010(a) to accomplish the regulation of the fisheries "without unjust discrimination." Having chosen the constitutional challenge as the more appropriate basis for reviewing the appeal in this case, we see no need to address the issue in statutory terms.

**6.** No balancing remains to be done. Balancing is inherent in the process of selection and application of the standard of review and is not itself a separate step. *State v. Ostrosky*, 667 P.2d 1184, 1193 n. 14 (Alaska 1983).

**7.** Both parties speculate that administrative convenience is the basis for the use of census districts. Although administrative convenience is legitimate, it cannot in itself outweigh the applicant's interest in the limited entry permit. *CFEC v. Apokedak*, 606 P.2d 1255, 1266 (Alaska 1980).

small isolated coastal town dependent upon fishing, the classification is impermissibly underinclusive. Because persons who happen to be located within less populous census districts are automatically awarded the maximum point allotment, despite their proximity to the occupations available in a major urban center across the census district boundary, the classification is impermissibly overinclusive.[8]

In short, we are unable to conclude that a fair and substantial relation exists between the availability in an applicant's domicile of alternative occupations and the wholesale use of census districts as the means of determining that availability. As a result, the legislative mandate to avoid unjust discrimination by the establishment of a relative hardship scale giving preference to those who have fewer occupational alternatives available to them is frustrated.

Consequently, we find that the scheme set forth in 20 AAC 05.630(b)(4) violates appellant's equal protection rights guaranteed by the Alaska Constitution. Accordingly, we REVERSE the judgment of the superior court and we REMAND this case to the CFEC for further proceedings.[9]

RABINOWITZ, Justice, dissenting.

The Court holds that there is not a fair and substantial relation between residence in a particular census district and availability of alternative occupations. 689 P.2d at 490. Justice Compton, who concurs with the Court's holding, believes that "[t]here

is simply no justification for [the] anomalies" the Commission's regulation creates. 689 P.2d at 494. I disagree. The obvious premise underlying the regulatory scheme is that in primarily urban areas more jobs and more kinds of jobs are available than in primarily rural areas. In general, this is true, and I do not understand my colleagues to be holding otherwise. To the extent that they agree with Deubelbeiss that the Commission's reliance on census districts "simply bears no realistic correlation to whether a given applicant has alternative occupations available in his domicile," 689 P.2d at 489, I think both the majority opinion and the concurrence are wrong.

A census district is indeed "a federal population device for determining political representation." 689 P.2d 489. But it is also an area about which extensive federally collected information is available. Part of this information concerns a district's rural, suburban or urban character. If the Commission was concerned about distinguishing between rural and urban areas, census district boundaries provide logical, if rough, locations for the necessary lines. My colleagues imply that the Commission should have based its decisions on the road distances between applicants' homes and urban areas in which they might find work. 689 P.2d at 490 n. 8. Yet lines drawn on this basis may be just as arbitrary as the lines they reject.[1]

---

**8.** The CFEC ameliorated the effects of the "census district" criterion by providing that two additional points could be obtained by individuals residing in places which lack road access to "other potential areas of employment in his census district," 20 AAC 05.630(b)(4)(D), but it made no differentiation as to the *distance* from other possible areas of employment for those persons who did have road access. Thus, a resident of Ninilchik, forty road miles from Kenai, or of Homer, 80 road miles from Kenai, was awarded two points, while residents of Palmer and Wasilla, which are approximately forty road miles from downtown Anchorage, were awarded four points, and residents in the Fairbanks area living more than forty miles from downtown Fairbanks received zero points. In our opinion, there is no justification for these anomalies.

**9.** We express no opinion as to whether rectification of the unfairly discriminatory aspects of 20 AAC 05.630(b)(4) would, or should, result in the issuance of additional points to this applicant. It is the CFEC's task to further refine its criteria for the issuance of points in this category and to ascertain the effect of the refinements in this case.

**1.** Their implied alternative is only one of several possibilities. Deubelbeiss suggests that the Commission should have done a town-by-town analysis of the actual availability of alternative occupations. He also intimates that the inquiry should have included an examination of each applicant's employability.

If people like Deubelbeiss are automatically allocated fewer points for availability of alternative occupations because they happen to live within a specified distance of an urban center, despite the fact that they reside in a small fishing town,[2] then a scheme giving them fewer points is under-inclusive. If people living more than a specified distance from an urban center are automatically awarded the maximum point allotment, even though they might in fact commute to the urban center in search of work, the classification is overinclusive. Thus this alternative suffers from the same weaknesses as the Commission's regulation. But the choice among admittedly imperfect regulatory answers to complex problems is properly one for the Commission, not this court.[3] If the Commission's choice bears a "fair and substantial relation" to its admittedly proper purpose, *Isakson v. Rickey,* 550 P.2d 359, 363 (Alaska 1976), we should not disturb it. It does, and we shouldn't.[4]

2. I cannot accept the majority's characterization of Ninilchik as "isolated." 689 P.2d at 490.

3. This is true even if one tries to decide this case on statutory grounds. I do not understand the concurrence to be arguing that the regulations are actually inconsistent with AS 16.43.250. One of its objections may be that the regulations are not "reasonably necessary" to implement that statute; but it is clear from *Kelly v. Zamarello,* 486 P.2d 906 (Alaska 1971), that in applying the "reasonably necessary" test a court should defer to an agency's choice among acceptable alternatives. To say that we "substitute our judgment" for the agency's on these matters of judicial review is true, but I am not sure it is relevant. The question we are answering is one which assumes deference to the agency's decisions.

Similarly, it is for us to decide whether or not a CFEC regulation results in "unjust discrimination," but this fact does not necessarily allow us to reject Commission choices which we believe to be inferior to other alternatives. Rather, we must in effect decide whether a Commission choice denies applicants equal protection of the laws, and the "fair and substantial relation" test we use may or may not call for detailed consideration of possible alternatives, depending on the importance of the right asserted. *See, e.g., ALPAC v. Brown,* 687 P.2d 264, 270 (Alaska 1984); *see also id.* at 279 (Compton, J., dissenting) (calling a statute an "acceptable attempt to meet acknowledged differences").

COMPTON, Justice, concurring.

I concur in the result the court reaches. I would decide the case on statutory, rather than constitutional grounds, however.

The United States Supreme Court recently reaffirmed its adherence to the doctrine of abstaining from answering constitutional questions when other dispositive grounds exist. In *Escambia County v. McMillan,* — U.S. ——, ——, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36, 39 (1984), the Court observed:

It is a well established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case. See *Ashwander v. Tennessee Valley Authority,* 297 US 288, 347, 80 L Ed 688, 56 S Ct 466 [483] (1936) (Justice Brandeis, concurring).

I see no reason why this court should not exercise similar restraint, and no reason

4. This is not the occasion to try to harmonize the various equal protection standards this court has used in Limited Entry cases. *See, e.g., CFEC v. Apokedak,* 606 P.2d 1255, 1266 (Alaska 1980) (applicant has "important right to engage in economic endeavor"); *State v. Ostrosky,* 667 P.2d 1184, 1193 (Alaska 1983), *appeal dismissed,* — U.S. ——, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984) (interest in receiving entry permit by lottery or apprenticeship, as opposed to by purchase or inheritance, is "not of a high order"). Suffice it to say that this is not a challenge to Limited Entry in general or to a particular denial of the right to have one's application considered; instead, this is an attack on one facet of the point system with which the Commission evaluates applicants. Thus our review should be relatively deferential. *Rose v. CFEC,* 647 P.2d 154 (Alaska 1982).

This also is not the place to decide whether this matter should first be analyzed under AS 16.43.010(a)'s prohibition of "unjust discrimination" or under the Alaska Constitution's equal protection clause. The Court articulates no reason for its choice, but in practice the two inquiries are difficult to distinguish. *See* 689 P.2d at 490, and *compare Rose v. CFEC* (equal protection) with *CFEC v. Templeton,* 598 P.2d 77 (Alaska 1979) (AS 16.43.010(a)). *See also* note 3 *supra.*

why this case presents any exception. This court simply declines to exercise any restraint, without apparent reason. *See* 689 P.2d at 489, n. 5.

Alaska Statute 16.43.010(a) states:

It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination.

We have interpreted regulations enacted by the CFEC in such a fashion as to bring them into conformity with the statutory purpose to allocate permits without "unjust discrimination." *See State, Commercial Fisheries Entry Commission v. Templeton,* 598 P.2d 77, 81 (Alaska 1979). *See also, Jones v. Commercial Fisheries Entry Commission,* 649 P.2d 247, 251 (Alaska 1982).

Clearly, 20 AAC 05.630(b)(4) must be found to be compatible with AS 16.43.010(a) if it is to be approved. It is equally clear that the test for compatibility with AS 16.43.010(a) is at least as strict as the Alaska equal protection test, since a statute which required no more of a regulation than that it avoid violating the constitutional right to equal protection would be superfluous. It is also apparent that the essence of Deubelbeiss' objection to the regulation is that it does in fact "unjustly discriminate" within the meaning of AS 16.43.010(a). Since the equal protection test is, at the most, no stronger than the statutory test, there is no need to discuss the question raised in constitutional terms.

## I. STANDARD OF REVIEW

*Kelly v. Zamarello,* 486 P.2d 906 (Alaska 1971), presents a comprehensive Alaska discussion of the review in administrative cases. *Kelly* stresses as a preliminary matter the identification of the nature of the administrative action under investigation as either legislative, executive or judicial. *Id.* at 916–917. As to legislative actions taken under a specific delegation of legislative authority, such as the adoption of a regulation, the appropriate standard of review is set forth in *Kelly:*[1]

Thus, where an administrative regulation has been adopted in accordance with the procedures set forth in the Administrative Procedure Act, and it appears that the legislature has intended to commit to the agency discretion as to the particular matter that forms the subject of the regulation, we will review the regulation in the following manner: First, we will ascertain whether the regulation is consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rule-making authority on the agency. This aspect of review insures that the agency has not exceeded the power delegated by the legislature. Second, we will determine whether the regulation is reasonable and not arbitrary. This latter inquiry is proper in the review of any legislative enactment.

486 P.2d at 911. In the case before us no question is presented as to the interpretation of 20 AAC 05.630(b)(4). The question is whether a concededly "correct" interpretation of the regulation is in conflict with a statutory provision governing the agency's "legislative" enactments. Such a question is subject to review under the *Kelly* test. *See e.g., Union Oil Co. v. State,* 574 P.2d 1266, 1271 (Alaska 1978).

The first prong of the *Kelly* test is critical in a case, such as this one, where a regulation duly promulgated under a delegation of legislative authority as to one statute (AS 16.43.250(a)(1); AS 16.43.110(a)) allegedly conflicts with another statute (AS 16.43.010(a)) which restricts the scope of the delegation. In such a case, the key question for the reviewing court is whether the regulation, insofar as it con-

---

**1.** *See also Kenai Peninsula Fisherman's Cooperative Ass'n v. State,* 628 P.2d 897, 906 (Alaska 1981).

flicts with the restrictive statute, is outside the scope of the agency's authority. The court must "ascertain *whether the regulation is consistent with* and reasonably necessary to carry out *the purposes of the statutory provisions conferring rulemaking authority* on the agency." *Kelly*, 486 P.2d at 911 (emphasis added). If the regulation does not satisfy this test, it is invalid as being outside the powers delegated to the agency. Whether a regulation is outside the scope of delegated authority for this reason is a question as to the interpretation and elucidation of the statutes governing the scope of the agency's operations. It is the task of the judiciary to determine, in light of the legislature's statutory enactments, whether an agency has exceeded the bounds of its authority. Such a question is one in which an agency's expertise is of little or no assistance. The substitution of judgment standard is the appropriate standard of review under the first prong of the *Kelly* test.

As further support for applying the substitution of judgment standard, we consider the nature of the question before us. In this case, since there is no question as to the interpretation of 20 AAC 05.630(b)(4), the question of whether it is harmonious with AS 16.43.010(a) is, in effect, a question which calls for interpretation of the *statute*, not of the regulation. The interpretative question is whether it is "unjust discrimination" within the meaning of AS 16.-43.010(a) to award points for alternative occupations based on domicile in a census district. This determination is peculiarly within the judiciary's sphere. It is not a question whose resolution depends on administrative expertise.

## II. UNJUST DISCRIMINATION

Deubelbeiss asserts that 20 AAC 05.-630(b)(4) "does not realistically quantify availability of alternative occupations." While he agrees that, in general, it was appropriate for the CFEC to distinguish between urban and rural residents for the purpose of determining availability of alternative occupations, it is not adequate as a sole criterion. "[T]he particular adaptability, capacity, age and prior skills of an individual applicant is an essential measure [sic] of his ability to participate in an alternative occupation," he says. The use of census districts is simply too broad and rough a criterion to adequately quantify a particular fisherman's dependence on a fishery.

The CFEC responds that "*any* criterion will necessarily be somewhat arbitrary," and the census district criterion is "reasonable." In the particular case of Ninilchik, which is approximately forty road miles from Kenai, it is not unreasonable to say that the job market in Kenai is "available" for a Ninilchik resident. The CFEC rejected individual aptitudes and training as criteria because it felt that income dependence would reflect these attributes, and it also saw "no fair and ready way to determine the availability of alternative occupations in terms of each individual's abilities." *Limited Entry*, Report to the Fisherman of Alaska, at 20 (CFEC, July 15, 1974). The CFEC did include a provision accommodating bush residents who have no road access to other areas of employment in 20 AAC 05.630(b)(4)(D), and it claims that this provision sufficiently individualizes the "census district" criterion to justify the regulation.

Although the CFEC ameliorated the effects of the "census district" criterion by providing that additional points could be obtained by individuals residing in places which lack road access to "other potential areas of employment in his census district," 20 AAC 05.630(b)(4)(D), it made no differentiation as to the *distance* from other possible areas of employment for those persons who did have road access. Thus, a resident of Ninilchik, forty road miles from Kenai, or of Homer, 80 road miles from Kenai, was awarded two points, while residents of Palmer and Wasilla, which are approximately forty road miles from downtown Anchorage, were awarded four points, and residents in the Fairbanks area living more than forty miles from downtown Fairbanks received zero points.

There is simply no justification for these anomalies, in my opinion.[2] While it is of course true that inequities will always result from any arbitrary criteria, and that deciding where to draw the lines is difficult, these truisms do not excuse the CFEC's failure to prevent the most obvious inequities from occurring.

Substituting my judgment for the CFEC's on the question of whether 20 AAC 05.630(b)(4) results in "unjust discrimination" within the meaning of AS 16.43.-010(a), I conclude that it does.

My resolution of the question does not purport to direct the CFEC to consider aptitudes, educational levels or other individual characteristics of applicants in determining the availability of alternative occupations. It is the task of the CFEC to ascertain the criteria appropriate for ranking applicants. However, having selected criteria, it is also the CFEC's task to ensure sufficient refinement in the ranking process to avoid unjust discrimination. The urban/rural criterion, even as ameliorated by the "road access" provision, does not provide the requisite degree of exactitude to satisfy the mandate of AS 16.43.-010(a) to avoid "unjust discrimination."

Whether the CFEC chooses to further refine 20 AAC 05.630(b)(4) through the promulgation of further specific criteria, (e.g., distance from an urban community or other substantial center of population; unemployment statistics within a given census district; individual abilities and/or aptitudes), or through a nonspecific "special circumstances" provision is for the CFEC to decide, in the exercise of its quasilegislative authority. All that I would require is that the methods chosen have a reasonable basis, and that they have an effect which avoids *unjust* discrimination in the final result. I recognize that *some* discrimination is inevitable any time lines are drawn.

Regulations are entitled to a presumption of validity, and it is the applicant's burden to establish, through facts and argument, that a particular regulation results in unjust discrimination. I would not lightly conclude that one does, and I recognize the administrative and practical limitations which justify a degree of imprecision. I would not, however, accept rough-hewn guidelines which result in substantial discrimination where more precise differentiations may readily be made. Accordingly, I would reverse the judgment of the superior court and remand this case to the CFEC for further proceedings.[3]

---

2. These anomalies are not restricted to Alaska. A person who lived within thirty miles of downtown Spokane, Washington, could receive zero, two or four points depending on which direction from the city he or she lived. Similarly, zero, two or four points could be awarded to persons within a thirty mile radius of downtown Portland, Oregon.

3. I express no opinion as to whether rectification of the unfairly discriminatory aspects of 20 AAC 05.630(b)(4) would, or should, result in the issuance of additional points to this applicant.