STATE of Alaska, Petitioner,

v.

Joseph J. HAZELWOOD, Respondent.

No. S–5311.

Supreme Court of Alaska.

Dec. 3, 1993.

Cynthia M. Hora, Asst. Atty. Gen., Richard W. Maki, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for petitioner.

Richard H. Friedman and Jeffrey K. Rubin, Friedman & Rubin, Anchorage, Michael G. Chalos, Thomas Russo, Chalos, English & Brown, New York City, and Dick L. Madson, Fairbanks, for respondent.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, and COMPTON, JJ.

### OPINION

RABINOWITZ, Justice.

This petition for hearing presents essentially two issues: (1) whether as a matter of federal law the State demonstrated that it had an independent source for the evidence it introduced against Captain Joseph Hazelwood at his criminal trial; and (2) whether as a matter of federal law use and derivative use immunity granted under the Federal Water Pollution Control Act, 33 U.S.C. § 1321(b)(5), is subject to an inevitable discovery exception.

### FACTS AND PROCEEDINGS

On March 24, 1989, the *Exxon Valdez* ran aground off Bligh Reef, spilling eleven million gallons of oil into Prince William Sound. The captain of the tanker, Joseph J. Hazelwood (Hazelwood), radioed the Coast Guard approximately twenty minutes after the grounding and stated:

> Yeah, ah Valdez back, ah we've, should be on your radar there, we've fetched up ah hard aground, north of Goose Island, off Bligh Reef, and ah evidently leaking some oil and we're gonna be here for awhile and ah, if you want ah, so you're notified, over.

Subsequently, the State charged Hazelwood with several crimes related to the grounding. Hazelwood moved to dismiss the charges and suppress evidence, arguing that all of the State's evidence was derived either directly or indirectly from his notification, and that its admission violated the immunity granted by 33 U.S.C. § 1321(b)(5) and the principles of *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

The superior court denied Hazelwood's motions, accepting the State's arguments that (1) 46 U.S.C. § 6101, the marine casualty reporting statute, and its implementing regulation constituted a separate and independent source for the State's evidence; and (2) the evidence used by the State would have been inevitably discovered. A jury subsequently convicted Hazelwood of negligent discharge of oil. The court of appeals reversed Hazelwood's conviction, holding as a matter of law that the marine casualty statute and regulation did not constitute an independent source for the State's evidence and that the inevitable discovery doctrine was inapplicable in the context of a congressionally enacted grant of immunity. *Hazelwood v. State*, 836 P.2d 943 (Alaska App.1992). We subsequently granted the State's petition for hearing as to both the independent source and inevitable discovery rulings.

### DISCUSSION

A. *Protection from Prosecution Provided*

by 33 U.S.C. § 1321(b)(5).[1]

■ The federal reporting requirement for oil and hazardous substance discharges, 33 U.S.C. § 1321(b)(5), includes a statutory grant of immunity from criminal prosecution. At the time of Hazelwood's offense, the statute provided for both use and derivative use immunity:[2]

> Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person ... who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. *Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.*

33 U.S.C. § 1321(b)(5) (1988) (amended 1990) (emphasis added).[3] Hazelwood argues that

---

1. The scope of immunity under 33 U.S.C. § 1321(b)(5), and *its constitutionally permissible* exceptions, are issues of federal law. Thus United States Supreme Court precedent, rather than *our own precedent, controls our resolution of this case.*

The difference this distinction can make is illustrated in our recent decision in *State v. Gonzales*, 853 P.2d 526 (Alaska 1993). There, we were presented with the question whether a statute authorizing an order compelling testimony based on a grant of use and derivative use immunity satisfied the scope of the privilege against self-incrimination provided for in article I, section 9 of the Alaska Constitution. We concluded that use and derivative use immunity impermissibly dilutes the protection of article I, section 9. *Id.* at 530.

2. Use and derivative use immunity allows prosecution for the crimes referred to in the compelled testimony, but prohibits use of the compelled testimony and evidence derived therefrom in such prosecutions. *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). The statute at issue in *Kastigar* directed that when the district court issued an order compelling a witness to provide testimony, "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." 18 U.S.C. § 6002 (1988). The U.S. Supreme Court held that the grant of immunity provided protection equivalent to the Fifth Amendment privilege against self-incrimination:

> The statute's explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and there-

fore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

*Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (footnote omitted) (alteration in original).

3. The Oil Pollution Act of 1990 included several amendments to 33 U.S.C. § 1321(b)(5). *See* Pub.L. No. 101–380, § 4301(a), 104 Stat. 484, 533 (1990). The provision now reads:

> Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge.... Any such person ... who fails to notify immediately such agency of such discharge shall, upon conviction, be fined in accordance with title 18, or imprisoned for not more than 5 years, or both. Notification received pursuant to this paragraph shall not be used against any such natural person in any criminal case, except a prosecution for perjury or for giving a false statement.

by admitting evidence that he notified the Coast Guard about the spill, and by admitting evidence derived from this notification, the superior court violated this statutory grant of immunity.

### B. *Applicability of the Independent Source Doctrine.*

■ The State argues that the evidence admitted was obtained through a source independent of Hazelwood's notification, and thus was not subject to exclusion. The U.S. Supreme Court has explicitly recognized that a statutory grant of use and derivative use immunity, like the Fifth Amendment's protection against self-incrimination, "allow[s] the government to prosecute using evidence from *legitimate independent sources.*" *Kastigar v. United States,* 406 U.S. 441, 461, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972) (emphasis added). However, once a defendant shows that he or she testified under a statutory grant of immunity, the burden shifts to the prosecution "to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665. We must determine, then, whether the State has met its burden of proving that the evidence admitted against Hazelwood was obtained from a source wholly independent of the notification compelled by the statute.

The State argues that upon grounding the *Exxon Valdez,* Hazelwood incurred two separate legal reporting duties. Under the oil spill statute, 33 U.S.C. § 1321(b)(5), he was required to report that he was discharging oil. Under the marine casualties reporting statute, 46 U.S.C. § 6101,[4] and its implementing regulations, he was required to report that the ship had grounded. The marine casualty statute and regulations also require that the person making the report provide additional information, such as the identity and location of the ship. 46 C.F.R. § 4.05–1, –5 (1992).

Parsing Hazelwood's radio transmission, the State argues that only one part of it is protected under the grant of immunity. According to the State, Hazelwood's statement that the tanker "evidently [was] leaking some oil" was sufficient to fulfill his obligation under the oil spill statute. This statement, the State concedes, is covered by the statute's immunity clause. The State argues, however, that any additional information provided by Hazelwood, specifically "we've fetched up ah hard aground north of Goose Island, off Bligh Reef," was reported pursuant to the marine casualty statute, and thus amounted to a source of evidence wholly independent of the immunized statement.[5]

We cannot accept the State's arguments. As noted by the court of appeals, the State's argument rests on the premise that, under the oil spill reporting statute, Hazelwood was required to report nothing more than the fact that his ship was discharging oil. *Hazelwood v. State,* 836 P.2d 943, 948 (Alaska App.1992). Interpreting the statute to require no more than this would be unreasonable. Congress initially enacted the oil spill statute as part of legislation designed to improve the nation's water quality.[6] Viewed in light of this overall purpose, the notification process required by the statute must be construed to require that regulatory officials be provided with adequate information, such as the location of the spill, so that they may begin immediate remedial measures. Thus we decline to hold

---

33 U.S.C. § 1321(b)(5) (Supp. III 1991).

**4.** At the time of Hazelwood's offense, this statute called for regulations to require reporting of a number of marine casualties, including "material loss of property" and "material damage affecting the seaworthiness or efficiency of the vessel." 46 U.S.C. § 6101(a)(3), (4) (1988) (amended 1990). The Oil Pollution Act of 1990 added a subsection (5) to this provision. Pub.L. No. 101–380, § 4106(b), 104 Stat. 484, 513 (1990). The new subsection added "significant harm to the environment" to the list of marine casualties that are required to be reported. *See* 46 U.S.C. § 6101(a)(5) (Supp. III 1991).

**5.** The State analogizes the "statements" in this case to the two statements at issue in *United States v. Lipkis,* 770 F.2d 1447, 1450–51 (9th Cir.1985). *Lipkis* is inapplicable, however, as in that case there were two separate statements made six months apart. *Id.* at 1449.

**6.** *See* 33 U.S.C. § 1251(a) (1988) ("The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.").

that Hazelwood's statement concerning the location of the vessel was made solely to comply with the marine casualty statute and therefore provided an independent source.

Furthermore, the U.S. Supreme Court clearly stated in *Kastigar* that the government must "prove that the evidence it proposes to use is derived from a legitimate source *wholly independent*" of the immunized statement. 406 U.S. at 460, 92 S.Ct. at 1665 (emphasis added). In this case, there is only one source: Hazelwood's single radio transmission made shortly after the *Exxon Valdez* ran aground on Bligh Reef. The State asks us to accept the contention that Hazelwood's radioed statement to the Coast Guard was immunized at one point and an independent source at another. The initial report cannot be divided: it was a single radio transmission made shortly after the *Exxon Valdez* ran aground on Bligh Reef. We cannot accept this argument in the face

of *Kastigar*'s requirement that the independent source be "wholly independent" from the immunized source. We therefore AFFIRM this aspect of the court of appeals' decision.

### C. The Application of the Inevitable Discovery Doctrine Under 33 U.S.C. § 1321(b)(5).

▇▇▇ Alternatively, the State argues that the evidence admitted against Hazelwood at trial was admissible under the inevitable discovery doctrine.[7] The United States Supreme Court recognized the inevitable discovery doctrine in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The doctrine is an exception to the exclusionary rule [8] in cases where evidence has been obtained in violation of constitutional protections such as the Fifth Amendment privilege against self-incrimination.[9] The doctrine is

**7.** The court of appeals noted:

In the present case, witnesses called by the state during the evidentiary hearing testified that the grounding of the *Exxon Valdez* would in all likelihood have been discovered and investigated, with negligible delay, even if Hazelwood had failed to notify the Coast Guard immediately. Based on this testimony, Judge Johnstone declared the inevitable discovery doctrine applicable:

The defendant's report of the grounding notwithstanding, the state inevitably would have discovered the grounding of the *Exxon Valdez* and initiated the investigatory process by not later than 12:45 a.m. on March 24, 1989. The court further concludes, based on the facts, that the investigating team ... would have arrived at approximately the same time as they, in fact, did. Any observation made or investigation actually commenced would have been made or commenced at approximately the same time.

*Hazelwood*, 836 P.2d at 951 (alteration in original).

The dissent observes, "It is difficult to conceive how Hazelwood's oral *statements*—specific pronouncements occurring at specific points in time—ever could have been 'inevitably discovered.'" This observation misstates the State's position and misinterprets our opinion. First, at no point in its briefing does the State contend that the text of Hazelwood's radio transmissions made to the Coast Guard within 20 minutes of the grounding is admissible in evidence. Rather, the State argues that as a consequence of the court of appeals' decision it is placed in a position where it cannot use any of the evidence gained from its investigation of the oil spill, despite the superior court's factual findings that the

State would have discovered the accident. Second, our opinion is limited to the question whether the grant of immunity provided for in 33 U.S.C. § 1321(b)(5) is subject to the inevitable discovery doctrine. We express no view as to the admissibility of any particular portion of the State's evidence against Hazelwood. Such evidentiary questions remain for resolution by the court of appeals on remand.

**8.** The Supreme Court described the exclusionary rule as a "doctrine requiring courts to suppress evidence as the tainted 'fruit' of unlawful governmental conduct." *Nix*, 467 U.S. at 441, 104 S.Ct. at 2507–08. The exclusionary rule applies "not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." *Id.* (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). Furthermore, the exclusionary rule extends to "evidence that was the indirect product or 'fruit' of unlawful police conduct." *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

The Supreme Court was careful to emphasize, however, that information or evidence illegally obtained "need not always be suppressed." *Id.* Thus, the Supreme Court has recognized exceptions to the exclusionary rule, such as the independent source doctrine and the inevitable discovery doctrine.

**9.** *See Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964) ("[A] state witness may not be compelled to give testimony which may be incriminating ... unless the compelled testimony and its fruits cannot be

essentially a variation on the independent source rule, except that the question is not whether the police actually obtained evidence from an untainted source, but whether evidence obtained through a constitutional violation would inevitably have been discovered through a lawful means. 4 Wayne R. La-Fave, *Search and Seizure* § 11.4(a), at 378 (2d ed. 1987).

■ The Supreme Court noted that the "core rationale" for the exclusionary rule is "to deter police from violations of constitutional and statutory protections." *Nix,* 467 U.S. at 442–43, 104 S.Ct. at 2508. "On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired." *Id.* at 443, 104 S.Ct. at 2508. However, the rule is not meant to put the prosecution in a position *worse* than if no police misconduct occurred. *Id.*[10] Thus the Supreme Court has recognized the inevitable discovery doctrine. If the prosecution can prove that the challenged evidence "ultimately or inevitably would have been discovered by lawful means, ... then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444, 104 S.Ct. at 2509.

■ Hazelwood contends that the absence of a deterrence rationale makes the inevitable discovery doctrine "inappropriate in the context of immunity analysis." Hazelwood asserts that the exclusionary rule and exceptions thereto were developed by balancing two competing interests: the need to deter police misconduct and the need for evidence of wrongdoing to convict the wrongdoer.

Exceptions to the exclusionary rule are recognized because the interest of deterring illegal police conduct is not enhanced by excluding evidence that would have been found legally.

Hazelwood argues, however, that the purpose behind excluding information derived from immunized testimony is unrelated to deterrence of official misconduct. Rather, the exclusionary rule serves to enforce the government's assurance that no immunized statement or evidence derived therefrom will be used against a person compelled to give the statement. Additionally, Hazelwood contends that while courts are free to modify the judicially created exclusionary rule, only Congress can change the scope of the immunity statute it created. Thus he concludes that the inevitable discovery doctrine cannot apply in the context of a statutory grant of immunity.

The court of appeals agreed, finding a critical distinction between the role played by the exclusion of illegally obtained evidence and that played by exclusion of evidence derived from immunized information. Based on this perceived distinction the court of appeals concluded that "the inevitable discovery doctrine—an exception rooted in the pragmatism of the exclusionary rule and its narrow deterrent purpose—has no application in the immunity context." *Hazelwood v. State,* 836 P.2d 943, 953 (Alaska App.1992).[11] We disagree.

The U.S. Supreme Court's opinion in *Nix* is of significance here. There the defendant contended that certain evidence was derived

---

used in any manner by ... officials in connection with a criminal prosecution against him.").

10. Specifically, the Supreme Court explained:

The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a

better position than it would have been in if no illegality had transpired.

By contrast, the derivative evidence analysis ensures that the prosecution is not put in a worse position simply because of some earlier police error or misconduct.

*Id.* 467 U.S. at 442–43, 104 S.Ct. at 2508.

11. The court of appeals reasoned in part that the primary purpose of the exclusionary rule is to deter official lawlessness, and the application of the inevitable discovery rule in such circumstances serves to temper the impact of the exclusionary rule. On the other hand, in the immunity context no deterrent purpose is served, as the purpose of exclusion is to enforce the privilege against self-incrimination and the government's promise. *Hazelwood,* 836 P.2d at 951–53.

from a police interrogation conducted in violation of his Sixth Amendment right to counsel. 467 U.S. at 441, 104 S.Ct. at 2507. He challenged application of the inevitable discovery rule, arguing that the purpose for the exclusionary rule under the Sixth Amendment was not to deter police misconduct but to preserve the right to a fair trial and the integrity of the factfinding process. *Id.* at 446, 104 S.Ct. at 2510.

The Court disagreed, stating that "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Id.* The Court again emphasized that the exclusionary rule was not meant to put the State in a worse position than would have been the case had the illegality not occurred. The *Nix* defendant's interpretation of the rule placed the State at a disadvantage, and the Supreme Court rejected this result, noting that "[s]uppression in these circumstances ... would inflict a wholly unacceptable burden on the administration of criminal justice." *Id.* at 447, 104 S.Ct. at 2510.

The argument Hazelwood presents in the context of a statutory grant of immunity is similar: the lack of a deterrence rationale for the exclusionary rule precludes the application of the inevitable discovery exception to the rule. While the U.S. Supreme Court has not directly addressed this question, we think the foregoing discussion in *Nix* provides the answer.

In order to determine whether an exception to the exclusionary rule is permissible, we, like the U.S. Supreme Court in *Nix*, must balance the societal costs of excluding evidence against the particular interest the rule might serve: deterrence of police misconduct, preservation of the right to a fair trial, or enforcement of the government's promise. If we accept Hazelwood's contention and hold that the inevitable discovery doctrine is not applicable in the immunity context, the State will be in a worse position than if the statutory grant of immunity did not exist. We do not think the interest served by the exclusionary rule in the immunity context requires such a result. Rather, we hold that when the evidence at issue inevitably would have been discovered without reference to immunized statements, "there is no nexus sufficient to provide a taint and the evidence is admissible." *Id.* at 448, 104 S.Ct. at 2511; *see also United States v. Kiser*, 948 F.2d 418, 422–23 (8th Cir. 1991).[12]

The court of appeals also concluded that application of the inevitable discovery doctrine would defeat the congressional purpose in granting immunity for the immediate report of a spill. The court of appeals reasoned that persons who potentially stood to incriminate themselves would be discouraged from complying if it were predictable at the outset that the inevitable discovery doctrine would apply. *Hazelwood*, 836 P.2d at 953.

■ Again we disagree. Congress did not rely solely upon the grant of immunity to encourage the reporting of oil spills. The oil spill statute itself provides stiff penalties for those failing to notify the authorities of a spill.[13] A failure to notify would be a criminal act in addition to any criminal acts causing the spill.[14]

**12.** The court of appeals appears to have weighed whether Alaska law, rather than federal law, should recognize inevitable discovery in immunity cases. *See Hazelwood*, 836 P.2d at 951 ("For present purposes, we may assume that the inevitable discovery doctrine would be adopted in Alaska in appropriate cases...."). The court's reliance on Justice Marshall's dissent in *Kastigar*, *see Hazelwood*, 836 P.2d at 952 (quoting *Kastigar*, 406 U.S. at 470–71, 92 S.Ct. at 1669–70 (Marshall, J., dissenting)), would be appropriate had the court of appeals been deciding Alaska law. But in this case we are interpreting federal law, and thus are bound by the acceptance of the inevitable discovery rule in *Nix* and the constitutionality of use and derivative use immunity in *Kastigar*.

**13.** *See* 33 U.S.C. § 1321(b)(5) (1988) (amended 1990) ("Any such person ... who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both.").

**14.** The court of appeals further reasoned that Congress, not the court, should decide if the inevitable discovery rule is applicable to 33 U.S.C. § 1321(b)(5). We disagree. Congress, in drafting this statute, used terms of art that indicate use and derivative use immunity. The role of this court is to interpret the statute Congress has enacted, including the grant of immunity, within the context of Supreme Court precedent.

We therefore hold, in accordance with the applicable U.S. Supreme Court precedent, that the court of appeals erred in ruling that the inevitable discovery doctrine has no application in the context of this statutory grant of immunity. Since our reading of *Kastigar* and *Nix* impels us to the conclusion that application of the doctrine of inevitable discovery to the use and derivative use immunity provided for in 33 U.S.C. § 1321(b)(5) is permissible, we remand this case to the court of appeals for further proceedings.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings.[15]

BURKE, J., not participating.

COMPTON, Justice, dissenting in part.

I am unpersuaded by the court's conclusion that *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (no violation of Fifth Amendment privilege against self incrimination when evidence derived from a wholly independent source), and *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (no violation of Sixth Amendment right to counsel when evidence would have been inevitably discovered regardless of violation), compel application of the doctrine of inevitable discovery to the statutory grant of immunity provided in 33 U.S.C. § 1321(b)(5). *See* Op. at 834. The immunity granted by 33 U.S.C. § 1321(b)(5), coextensive with the protection afforded by the Fifth Amendment, is very broad.[1] The doctrine of inevitable discovery is incompatible with the mandate that an immunized report and information derived from the exploitation of an immunized report is not admissible in a criminal proceeding against the declarant. I would affirm the decision of the court of appeals that so holds.[2]

At the outset, it is important to know what evidence Hazelwood sought to suppress.[3] Hazelwood filed separate motions relating to the admissibility of evidence. One motion asserted essentially that all evidence supporting the charges against him was derived from the exploitation of his immunized report, and hence was inadmissible. Dismissal of the charges was the remedy Hazelwood sought. Another motion, based on the same theory, sought suppression of the result of a blood alcohol test taken while Hazelwood was still aboard the *Exxon Valdez.* A third motion, again based on the same theory, sought suppression of four specific statements:

> The first statement was made in a radio call to the Coast Guard and reported that

---

**15.** As noted previously on remand the court of appeals may be required to address several other specifications of error raised by Hazelwood depending on its review of the superior court's predicate findings regarding the applicability of the inevitable discovery doctrine.

**1.** The scope of immunity articulated in *Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), has not been narrowed. *Murphy,* commented on with approval in *Nix,* recognized the independent source doctrine, reaffirmed in *Kastigar.*

Furthermore, one court has noted that the specific federal statute in question requires that "prosecution be based on evidence other than notification or information obtained by exploitation of such notification." *United States v. Republic Steel Corp.,* 491 F.2d 315, 318 (6th Cir. 1974) (addressing 33 U.S.C. § 1161(b)(4), which was later codified as 33 U.S.C. § 1321(b)(5)). The court emphasized the policy underlying the statute:

> If [a person] ... is denied protection from prosecution based solely on such reporting ... in cases where it might be difficult after passage of time to trace the source of a discharge,

> there would be incentive ... to withhold reporting a spill.
> *Id.*

**2.** It remains my view that a case should be decided on as narrow a ground as possible. Therefore, I would not have addressed the constitutional issues until first addressing whether the evidence supported application of or exceptions to any exclusionary rule. *Abood v. League of Women Voters of Alaska,* 743 P.2d 333, 345 n. 3 (Alaska 1987) (Compton, J., dissenting); *Deubelbeiss v. Commercial Fisheries Entry Comm'n,* 689 P.2d 487, 491 (Alaska 1984) (Compton, J., concurring). The court of appeals chose to approach the case differently, and thus it is necessary to address the issues as the court of appeals has arranged them.

**3.** The issue in this case is not whether Hazelwood himself is immune from prosecution, but whether evidence derived from the exploitation of Hazelwood's immunized report is admissible in a prosecution against him. The issue also is not whether the grounding of the *Exxon Valdez,* and resultant spillage of oil, would have been inevitably discovered. The answer to that question is too obvious to need comment.

the defendant was having some trouble with the third mate. The second statement was made in response to a question by Department of Environmental Control (DEC) investigator, Joe LeBeau. LeBeau asked the defendant what the problem was that caused the grounding, and the defendant replied, "You're looking at it." The third statement was a similar remark made in response to a similar question by Trooper Fox. The fourth statement is an interview of the defendant conducted by Coast Guard Chief Warrant Officer Mark Delozier, contained in state's exhibit 69. Order, *State v. Hazelwood,* No. 3AN–S89–7217 Cr./7218 Cr. (Alaska Super., December 18, 1989). These four statements were made before or during the government agents' initial boarding of the *Exxon Valdez.*

The court of appeals noted that "[h]ere, the superior court found, and the state has effectively conceded, that the evidence against Hazelwood was in fact obtained 'by the exploitation of' Hazelwood's report that the *Exxon Valdez* ran aground and was leaking oil." *Hazelwood v. State,* 836 P.2d 943, 953 (Alaska App.1992). The court does not dispute that this was the only source of the evidence which the State proposed to use against Hazelwood: his "single radio transmission made shortly after the *Exxon Valdez* ran aground on Bligh Reef." Op. at 831. This transmission was given pursuant to 33 U.S.C. § 1321(b)(5):

> Any person in charge of a vessel ... shall, as soon as he has knowledge of any discharge of oil ..., immediately notify the appropriate agency of the United States Government of such discharge.... Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used

against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

It is also important to keep in mind the rights guaranteed by the United States Constitution that are implicated in this case. The Fourth Amendment addresses searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fifth Amendment addresses the privilege against self incrimination:

> No person shall ... be compelled in any criminal case to be a witness against himself....

U.S. Const. amend. V. The Sixth Amendment addresses the right to assistance of counsel:

> In all criminal prosecutions, the accused shall enjoy the right ... to the assistance. of counsel for his defense.

U.S. Const. amend. VI. These rights apply in different ways and may be violated at different stages of the government's involvement with a citizen.

Violations of Fourth and Sixth Amendment rights are "fully accomplished" at the time of the offending government conduct. *See, e.g., Withrow v. Williams,* — U.S. —, —, 113 S.Ct. 1745, 1753, 123 L.Ed.2d 407 (1993) (Fourth Amendment); *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (Sixth Amendment).[4] They may occur even though no formal criminal charges are filed against the citizen. If formal charges

---

4. *Nix* and its predecessor, *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), involved the "Christian burial speech." Williams was charged with abducting a young girl in Des Moines, Iowa, but was arrested in Davenport, Iowa. Although the police agreed not to question Williams en route to Des Moines, a detective told Williams he wanted to give Williams something to think about "while we're traveling down the road.... I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial

for the little girl who was snatched away from them on Christmas [E]ve and murdered." In response, Williams asked the detective about the search for the girl, whether the police had found specific items of the girl's clothing, and why the detective thought they would pass near where the girl was buried. Williams then attempted to assist the police in locating items of the girl's clothing, and eventually led them to the place where she was buried. The trial court denied Williams' motions to suppress evidence relating to or resulting from his statements. His convic-

are filed, the remedy for such violations may be the exclusion of evidence obtained thereby. However, in *Nix* the Supreme Court accepted the inevitable discovery doctrine as an exception to the exclusionary rule for violations of the Sixth Amendment right to counsel.[5]

In contrast, a violation of the Fifth Amendment is not "fully accomplished" until the compelled evidence is used against the citizen at trial:

> The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial. The Fourth Amendment functions differently. It prohibits "unreasonable searches and seizures" whether or not the evidence is sought to be used in a criminal trial, and a violation of the Amendment is "fully accomplished" at the time of an unreasonable governmental intrusion.

*United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 1060, 108 L.Ed.2d 222 (1990) (citations omitted). Evidence admitted at trial over a valid assertion of the privilege against self incrimination violates the privilege. Thus exclusion of the evidence both *effectuates* the constitutional right *and prevents* the constitutional violation.

The United States Supreme Court has recognized that there is a predicate for application of the exclusionary rule: "It is clear that the cases implementing the exclusionary rule 'begin with the premise that the challenged evidence is *in some sense* the product of illegal governmental activity.'" *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 (1980) (emphasis added). However, Hazelwood does not rely on a claim of any illegal governmental activity prior to the State's effort to introduce compelled evidence in the criminal proceeding.[6] Exclusion of Hazelwood's immunized report and information derived from the exploitation thereof is not mandated by an exclusionary rule, but by the Fifth Amendment

---

tion was affirmed by the Iowa Supreme Court. In *Brewer,* Williams' conviction was set aside on the basis of a clear violation of the Sixth and Fourteenth Amendments to the United States Constitution. The Supreme Court observed that

> [w]hile *neither Williams' incriminating statements themselves nor any testimony describing his having led police to the victim's body can constitutionally be admitted into evidence,* evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams....

*Brewer,* 430 U.S. at 406 n. 12, 97 S.Ct. at 1243 n. 12 (emphasis added). This comment foreshadowed the Supreme Court's decision in *Nix.* It is noteworthy that the police were searching for the abducted girl *before* Williams made any statements and led the police to her body. In the case before us, the government was not looking for anything respecting the grounding of the *Exxon Valdez* until Hazelwood made his immunized statement.

5. The Supreme Court's rationale is rooted in history. It represents a pragmatic balancing of the integrity and fairness of a criminal proceeding on the one hand, and law enforcement's interest in obtaining reliable evidence on the other:

> More than half century ago, Judge, later Justice, Cardozo made his seminal observation that under the exclusionary rule "[t]he criminal is to go free because the constable has

blundered." Prophetically, he went on to consider "how far reaching in its effect upon society" the exclusionary rule would be when "the pettiest peace officer would have it in his power through overzeal or indiscretion to confer immunity upon an offender for crimes most flagitious." Someday, Cardozo speculated, some court might press the exclusionary rule to the outer limits of its logic—or beyond—and suppress evidence relating to the "body of a murdered" victim because of the means it was found. Cardozo's prophecy was fulfilled in *Killough v. United States,* 114 US App DC 305, 309, 315 F.2d 241, 245 (1962) (en banc). But when, as here, the evidence inevitably would have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible.

*Nix,* 467 U.S. at 447, 104 S.Ct. at 2511 (citations omitted).

6. The government's statutory mandate is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." The superior court described implementation of this mandate as follows:

> Polluting is generally always a crime. However, legislative bodies have balanced the need to abate and lesson [sic] pollution against the need to present all probative evidence in a criminal proceeding, and the balance has resulted in providing immunity to a polluter, in order to achieve regulatory goals.

itself: "No person ... shall be compelled in any criminal case to be a witness against himself...." [7]

I agree with the court's interpretation of 33 U.S.C. § 1321(b)(5) and its conclusion regarding the independent source doctrine. *See* Op. at 829–831. The use of evidence derived from a wholly independent source would not violate Hazelwood's Fifth Amendment privilege against self incrimination, as it would not be derived from the exploitation of Hazelwood's immunized report. However, information derived in fact from the exploitation of Hazelwood's immunized report violates his Fifth Amendment privilege against self incrimination and must not be admitted in evidence. Whether a citizen is afforded a constitutional right should not depend in the first instance on whether a trial court determines that evidence derived from the exploitation of an immunized statement would or would not have been inevitably discovered.[8]

Memorandum Decision and Order, *State v. Hazelwood*, No. 3AN–S89–7217 Cr./7218 Cr. (Alaska Super., December 29, 1989). It is noteworthy that no activity taken by the government in furtherance of its statutory mandate would have been restricted in the least by the exclusion of ,compelled evidence in the criminal proceeding against Hazelwood.

This point is relevant to the court's misplaced conclusion that the inevitable discovery doctrine is "essentially a variation on the independent source rule." Op. at 832. Although the *Nix* Court stated that the inevitable discovery doctrine is "functionally similar" to the independent source doctrine, *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509, the functional similarity is limited to the fact that "exclusion of evidence that would be inevitably discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Id.*

7. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court observed that "[t]he exclusionary rule, ... when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth." *Id.* at 601, 95 S.Ct. at 2260.

8. It is difficult to conceive how Hazelwood's oral *statements*—specific pronouncements occurring at specific points in time—ever could have been "inevitably discovered." Statements he made during the onboard investigation were used against him in a criminal proceeding. I do not know how it can be said that the government agents would have inevitably discovered these oral statements. It is one thing to make the tortured sequence of factual inferences—would have, would have, would have—leading to the conclusion that government agents would have arrived at the *Exxon Valdez* at about the same time as they did, with or without Hazelwood's initial immunized report. It is quite another to conclude that the agents would have asked Hazelwood the same questions and would have been given the same answers.

The practical problem with applying the inevitable discovery doctrine to oral statements made by Hazelwood simply highlights the fundamental analytical problem in applying the doctrine to information derived from the exploitation of an immunized statement. The government actually used "information obtained by the exploitation" of an immunized statement to convict the person compelled to make the statement. 33 U.S.C. § 1321(b)(5). This violates the statute and the Fifth Amendment privilege against self incrimination. Its use is not made any more permissible by musings about what hypothetically might have happened if the government had not used information derived from the exploitation of an immunized statement.