UNITED STATES of America,
Plaintiff-Appellee,

v.

Roger Wayne LIPKIS,
Defendant-Appellant.

No. 84–5274.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1985.

Decided Sept. 10, 1985.

Robert A. Pallemon, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Stephen Gilbert, Santa Monica, Cal., for defendant-appellant.

Before WALLACE, TANG, and WIGGINS, Circuit Judges.

TANG, Circuit Judge.

Roger Lipkis appeals his conviction for: (1) one count of conspiracy to defraud the United States by receiving "kickbacks" for referring Medi-Cal and Medicare business, under 18 U.S.C. § 371; (2) four counts of receiving "kickbacks," under 42 U.S.C. § 1396b; (3) five counts of making false statements on Medicare claim forms, under 42 U.S.C. § 1395nn; and (4) five counts of mail fraud for submitting the claim forms through the mails, under 18 U.S.C. § 1341. Lipkis raises two issues on appeal: first, that the government improperly used statements he made under an informal grant of immunity to obtain his indictment and to prosecute him; and, second, that there was a fatal variance between the false statement charges under 42 U.S.C. § 1395nn and the government's proof at trial. He therefore contends that the indictment should have been dismissed or, in the alternative, that there was insufficient evidence to support the jury's verdict on the false statement and mail fraud counts.

We affirm.

## FACTS

Roger Lipkis was the president and managing partner of Mobile Medical Industries (MMI), which provided management services for Mobile Medical Group (MMG), owned by a physician, Dr. David Gans. Under their organizational framework, MMG practiced medicine and MMI took care of the business of the practice.

MMG provided primary medical care, including diagnostic testing, on location to patients in board and care facilities and halfway houses in Central and Southern California. MMI provided vans to transport doctors, technicians and equipment to the patients. The primary source of payment for the company's services was the Medicare and Medi-Cal programs.

In 1977, Lipkis entered into an agreement with a medical laboratory, Automated Laboratory Services (ALS), whereby MMI would refer lab work to ALS in exchange for kickback payments of approximately twenty percent of ALS's revenue from MMI/MMG business. To account for the kickback payments, MMI provided ALS with certain services including collecting specimens, spinning down blood, supplying forms and stickers, and carrying insurance. The fair market value of these services was substantially less than the compensation MMI received from ALS, and there is no question that ALS was paying for the referrals as well as the described services. This arrangement lasted from April through October 1978. During this period, Lipkis instructed his billing clerk to bill Medicare for the same blood collection and handling services.

In May and June 1980, Lipkis met on three occasions with FBI agents to discuss the business relationship between MMI and ALS. The FBI was then investigating allegations that ALS was paying kickbacks as an inducement for the referral of Medicare business. Lipkis acknowledged receiving payments from ALS but maintained that they were fair compensation for specimen collection and handling services. These interviews produced twenty-two typed pages of notes. It is undisputed that Lipkis gave these statements voluntarily and free from government deception or duress.

The FBI sought to interview Lipkis again in December 1980 on the narrow issue of a possible "advice of counsel" defense for ALS. In the interim Lipkis had retained an attorney who negotiated with the United States Attorney for an "informal" grant of use immunity for statements made by Lipkis in the December interview sessions. It is clear that this limited grant of use immunity was not intended by the United States Attorney to encompass statements already made. Instead of focussing solely on the role of counsel in the MMI–ALS relationship, the December interviews covered most of the same particulars discussed in May.

The ALS investigation continued throughout 1981 and included yet another interview with Lipkis. Finally, in the fall of 1982 the United States Attorney's office offered Lipkis informal use immunity in exchange for grand jury testimony in the ALS matter. Lipkis appeared before the grand jury but asserted his Fifth Amendment privilege and did not provide any useful testimony. His indictment followed.

Lipkis moved to dismiss the indictment on the grounds that since his December 1980 statements were immunized and they substantially overlapped the May 1980 statements, the government could not, as a matter of law, meet its burden of showing that the information supporting his indictment came from a source untainted by the grant of immunity. Originally, the district court agreed with Lipkis and ruled that the December immunity applied retroactively to statements made in May. After reconsideration, however, the district court vacated its former ruling and held that the May 1980 statements were not retroactively immunized.

The court ordered the parties to make a joint submission on the question of whether the government had met its burden under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) to demonstrate affirmatively that its evidence was derived from a source independent from

immunized statements. The parties stipulated that the differences between the May and December 1980 statements were insignificant and did not trigger the *Kastigar* requirement of an evidentiary hearing. Lipkis argued, however, that the government should nonetheless be required to show affirmatively that any information obtained after December 1980 was not the result of the use or derivative use of immunized statements. The court ruled that the May interviews were a sufficient independent source under *Kastigar* for names of witnesses also mentioned in December, and that the government was free to use evidence derived from subsequent interviews with those individuals at trial.

Lipkis was tried before a jury. The government's proof on the false statement and mail fraud counts consisted of the testimony of MMI's billing clerk, Patricia Rayford; ten Medicare claim forms requesting payment for blood collection and handling services submitted during the period when ALS was paying MMI for these services; and Lipkis's own admission under cross-examination that he had instructed Rayford to bill Medicare for blood collection services paid for by ALS. The jury convicted Lipkis on all counts remaining before it and this appeal followed.

## IMMUNIZED TESTIMONY

We review under the clearly erroneous standard the district court's finding that the government's evidence was untainted by a grant of immunity. *United States v. Rogers*, 722 F.2d 557, 560 (9th Cir.1983), *cert. denied*, — U.S. —, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).

■ The United States Attorney may compel a witness to testify by immunizing his testimony from use against him in a subsequent criminal proceeding. *See* 18 U.S.C. §§ 6001–6005. The grant of use

immunity covers any use or derivative use of the particular testimony (18 U.S.C. § 6002) and is coextensive with the scope of the Fifth Amendment privilege against self-incrimination. *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972).[1] An individual who has testified under a grant of § 6002 use immunity is not shielded from all prosecution. Use immunity does not protect the substance of compelled testimony, it only protects against the use of compulsory testimony as a source for evidence. *Id.* at 453, 92 S.Ct. at 1661. Thus, before trial, the government must prove that any evidence it proposes to use against the witness is derived from a legitimate source wholly independent of his compelled and immunized testimony. *Id.* at 460–61, 92 S.Ct. at 1664–65.

■ On appeal Lipkis first contends that the use immunity granted him in December 1980 retroactively immunized his May 1980 statements. He argues that the government therefore was precluded from using either May or December statements to obtain his indictment or in its subsequent prosecution.

In making this argument, Lipkis ignores a crucial point: statements may only be immunized through an express grant by the United States Attorney, 18 U.S.C. § 6003(a). Lipkis concedes that the May statements were not immunized before he made them. Further, there was no evidence the United States Attorney intended to immunize them retroactively when he immunized the December 1980 statements. Absent a specific grant by the United States Attorney, the statements lack immunity as a matter of law. *Cf. Pillsbury v. Conboy*, 459 U.S. 248, 256–57, 103 S.Ct. 608, 614 (1983) (A district court cannot invest an individual with transactional, or

---

1. Before Congress passed the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922, of which § 6002 was a key provision, the government could compel testimony only by conferring "transactional" immunity on the witness. That meant he could not be prosecuted for any of the matters to which he testified

under a grant of immunity. Congress intended § 6002 "use" immunity to be less comprehensive, prohibiting use and derivative use of the testimony, not prosecution altogether. *See discussion in Pillsbury v. Conboy*, 459 U.S. 248, 253–55, 103 S.Ct. 608, 612–13, 74 L.Ed.2d 430 (1983).

complete, immunity on matters about which he testified under a grant of use immunity.).

Second, Lipkis contends that even if his May, 1980 statements were not immunized, the government failed to meet its burden under *Kastigar* of showing that all of the evidence it relied upon in prosecuting him came from sources wholly independent of his immunized December statements. He argues that the government did not show that all information uncovered *after* December 1980 was derived from untainted statements.

Lipkis points particularly to the testimony of FBI Special Agent Hersley, who interviewed Lipkis in both May and December and did not affirmatively identify non-immunized sources for his testimony. He further argues that both the prosecutor and Hersley, the government's primary witness, were "infected" by their first-hand knowledge of his immunized statements; therefore the government could not prove that no use was made of them. For this proposition he relies on *United States v. McDaniel*, 482 F.2d 305 (8th Cir.1973) and *United States v. Dornau*, 359 F.Supp. 684 (S.D.N.Y.1973), *rev'd on other grounds*, 491 F.2d 473 (2d Cir.), *cert. denied*, 419 U.S. 872 (1974).[2]

■ We reject this contention. Both cases involved the prosecutor's review of immunized testimony from a collateral source. There was no stipulation by the defendants that their immunized testimony was duplicated by nonimmunized testimony. Here, Lipkis stipulated that his May and December statements were the same in every material respect. In doing so, he conceded that the government knew everything in May that it heard again in December. It is as if the December statements were never made.

In this particular factual context, a showing that the government used any single nonimmunized statement from May rather than substantially identical immunized statements from December is impossible; more importantly, however, it is not necessary. Lipkis is in precisely the same position as if he had asserted his Fifth Amendment rights in December and said nothing. We conclude that the district court properly found that the May interviews provided the independent source for all information subsequently gathered, under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

■ Lipkis argues nonetheless that under our decision in *United States v. Zielezinski*, 740 F.2d 727 (9th Cir.1984) he was at least entitled to an evidentiary hearing before trial to determine whether the government intended to use immunized statements or the fruit of immunized statements. In *Zielezinski*, we held that where a grand jury indicts an individual who has testified before it under a grant of immunity, a *Kastigar*-style hearing is necessary to determine the independent grounds for the indictment. Even if proper, such an indictment *appears* tainted. 740 F.2d at 733. We held that only a separate evidentiary hearing could cure the appearance of impropriety in that situation. *Id.* at 734.

But our holding in *Zielezinski* does not compel a hearing here. Once Lipkis stipulated that there were only minimal differences between the May 1980 nonimmunized statements and the December 1980 immunized statements, a subsequent hearing would have served no purpose. The government clearly was entitled to use the nonimmunized May statements and any information derived from them. Because the May and December statements were substantially identical, all of the government's information reasonably could have derived from the May statements. Therefore, a hearing was unnecessary because no issues were left to resolve.

**2.** *Dornau* is slight authority for this proposition. On appeal the narrow issue involved was the extent of use immunity provided by a now superseded section of the Bankruptcy Act. The district court case cited by Lipkis was reversed on the grounds that the former Bankruptcy Act provision conferred only "use" immunity and not "derivative use" immunity. Therefore, the government's subsequent use of the testimony was proper. 491 F.2d 473, 479 (2d Cir.1974).

FALSE STATEMENTS

Lipkis contends that a fatal variance existed between the indictment and the proof on the false statement charges. The government characterizes this as an alleged constructive amendment, not a variance, citing *United States v. Von Stoll*, 726 F.2d 584 (9th Cir.1984). We review this question of constructive amendment de novo. *See United States v. Aguilar*, 756 F.2d 1418, 1421 (9th Cir.1985).

■ This dispute centers around an interpretation of 42 U.S.C. § 1395nn, which delineates offenses and penalties for making or causing false statements on federal health insurance claims. Sub-subsection 1395nn(a)(1) punishes:

> [W]hoever knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under this subchapter, ...

Lipkis was charged under 42 U.S.C. § 1395nn, and the facts alleged in the indictment suggest the crime falls under sub-subsection 1395nn(a)(1).[3]

The proof offered at trial was ten Medicare claim forms, each identifying blood handling services as claims for which MMI was entitled to payment. These services had already been paid for in full by ALS. Lipkis asserts that the crime the government proved at trial, if any, was the *omission* of a statement on the claim forms that MMI was already receiving payment for these services. He characterizes this as an

offense under § 1395nn(a)(3), but not § 1395nn(a)(1).[4]

We reject Lipkis's contention. Filing a claim for payment is an affirmative act. The false statement is the claim of entitlement to payment where the services have already been paid for. The United States Attorney obtained an indictment on these counts alleging the precise conduct proved and referring only to § 1395nn. The crime proved, in our view, was an affirmative act best characterized under § 1395nn(a)(1). This does not create a variance.

■ Even if we were to view the crime proved as an omission, better characterized as a § 1395nn(a)(3) offense, rather than an affirmative false statement, it is a distinction without a difference in this case. The indictment was sufficient to adequately apprise Lipkis of the crime with which he was being charged: making a false claim to Medicare for payment for blood handling services for which he had already received payment. The Fifth Amendment does not require more than an accurate statement of the factual bases of the crime charged in the indictment. A conviction may be sustained on the basis of a statute or regulation other than that cited or even where none is cited at all, as long as it is clear that the defendant was not prejudicially misled. Indeed, courts generally do not regard the statutory citation as *part* of the indictment. *See Williams v. United States*, 168 U.S. 382, 389, 18 S.Ct. 92, 94, 42 L.Ed. 509 (1897); *United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir.1983); *United*

---

3. The relevant portion of the indictment reads as follows:

21. On or about the dates listed below, within the Central District of California, defendant Roger Wayne Lipkis, knowingly and willfully caused false statements of a material fact to be made in applications to Blue Shield for payments in connection with blood-drawing services furnished by MMI under the Medicare program. The false statements of material fact were that Lipkis stated that he was entitled to be paid by Blue Shield for performing blood-drawing services, when in truth and in fact, as Lipkis well knew, he was being paid for performing those blood-drawing services by ALS.

4. Under § 1395nn(a)(3), an individual is punished for:

having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment, or (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefits or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized, ...

*States v. Clark*, 416 F.2d 63, 64 (9th Cir. 1969).[5]

Lipkis argues, however, that we approved a distinction analogous to the one he urges in *United States v. Stewart Clinical Laboratory*, 652 F.2d 804 (9th Cir. 1981), which concerned a separate section of the Public Health & Welfare Code. There, the defendants were indicted for offering to pay a remuneration to a doctor to induce him to refer his patients to a laboratory, in violation of 42 U.S.C. § 1396h(b)(2)(A). The defendants successfully argued that the government failed to prove that they had attempted to have any *person* referred to them. Rather, the only evidence was that they had attempted to have the doctor send blood and urine samples to their lab, a separate violation under 42 U.S.C. § 1396h(b)(2)(B). 652 F.2d at 806. The *Stewart* court found that the proof constituted a fatal variance, and dismissed the indictment.

We do not believe that *Stewart* is applicable here. In *Stewart*, the different crimes involved distinct conduct—bribery aimed at the referral of individuals on the one hand versus bribery aimed at the referral of lab work on the other. The *Stewart* defendants were entitled to notice of what conduct supported the government's indictment.

In this case, Lipkis made a false statement on applications for payment. He was clearly given notice of the conduct that supported the government's indictment. We fail to see any appreciable difference in whether the "falseness" was accomplished by commission or omission, and the difference, if any, did not prejudice Lipkis. The proof in either case is on the face of the documents in evidence and in the testimony of Lipkis's billing clerk and Lipkis himself.

Under these circumstances we find no variance between the charges and the proof, no constructive amendment of the indictment, and no effect on Lipkis's substantial rights. *See United States v. Von Stoll*, 726 F.2d 584 (9th Cir.1984); *United States v. Kaiser*, 660 F.2d 724, 730 (9th Cir.), *cert. denied*, 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 (1981).

### SUFFICIENCY OF THE EVIDENCE

We review whether sufficient evidence supports a conviction by determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In doing so, we view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Lipkis claims that the evidence was insufficient to convict him on the false statement and mail fraud charges on the same "commission-omission" grounds that he relied on for his fatal variance argument. He argues that no rational trier of fact could have found that the Medicare claim forms required him to explain that MMI had already been paid for the blood handling services, and therefore the essential elements of the crime of "omission" were not proved.

We do not need to interpret the Medicare claim forms to decide this matter. We have already held that Lipkis's claims for payment constituted false statements of entitlement for benefits under 42 U.S.C. § 1395nn. The government's evidence included Medicare claim forms containing these false statements, the testimony of Lipkis's billing clerk that she filled them

---

**5.** Rule 7(c), Fed.R.Crim.P. provides that an indictment "shall state for each count the official or customary citation of the statute, rule, regulation, or other provision of law which the defendant is alleged therein to have violated." In the Advisory Committee Note to this subdivision the committee acknowledges the settled law that the citation is not a part of the indictment and goes on to explain:

"[This] provision of the rule, in view of the many statutes and regulations, is for the benefit of the defendant and is not intended to cause a dismissal of the indictment, but simply to provide a means by which he can be properly informed without danger to the prosecution."

out at Lipkis's request, and Lipkis's own admission that he knew he was making a claim for double payment when he submitted the forms through the mail. Viewing this evidence in the light most favorable to the government, we find that a rational trier of fact could have found Lipkis guilty of the false statement and mail fraud charges beyond a reasonable doubt.

The judgment is AFFIRMED.