**UNITED STATES of America, Plaintiff,**

v.

**Cecilio ESPARZA–PONCE, Defendant.**

**No. Crim. 97–3252–R.**

United States District Court, S.D. California.

May 18, 1998.

---

Alan D. Bersin, U.S. Atty., Jennifer E. Braccia, Asst. U.S. Atty., San Diego, CA, for Plaintiff.

Benjamin L. Coleman, Federal Defenders of San Diego, Inc., San Diego, CA, for Defendant.

## AMENDED ORDER ADDRESSING PRETRIAL MOTIONS [1]

RHOADES, District Judge.

### I. Overview

Defendant has filed motions (1) to dismiss the indictment; (2) to suppress statements; (3) to compel discovery; and (4) for leave to file further motions. The government has filed motions for reciprocal discovery and for fingerprint exemplars.

For the reasons stated below, Defendant's motion to dismiss is denied. Defendant's motion to suppress is denied in part and deferred in part. Defendant's motion to compel discovery is deferred. Defendant's motion for leave to file further motions is denied without prejudice. The government's motions are granted.

### II. Background [2]

Defendant Cecilio Esparza–Ponce, a Mexican citizen, legally resided in the United States. On May 22, 1986, Defendant was convicted of petty theft in violation of California Penal Code sections 484 and 488. On that date, Defendant also was convicted of battery, in violation of California Penal Code section 242. Less than seven months later, Defendant was convicted of attempted first-degree burglary, in violation of California Penal Code sections 459 and 664.

Because of Defendant's convictions, the Immigration and Naturalization Service ("INS") commenced deportation proceedings against him. Defendant retained counsel. On July 6, 1994, Defendant appeared before an immigration judge but, because of a breakdown in communication, his attorney did not appear. Accordingly, the immigration judge decided to postpone the hearing until October 13, 1994.

Before adjournment, however, Defendant expressed a desire to apply for discretionary relief from deportation. The immigration judge told Defendant to apply for discretionary relief in writing by August 14, 1994. The immigration judge warned Defendant that if he did not file the paperwork, the request for discretionary relief would be deemed abandoned.

Defendant never applied in writing. On September 12, 1994—prior to the hearing—the immigration judge ordered Defendant deported. Thus, quite apart from the fact that Defendant had procedurally defaulted on his request for *discretionary* relief, Defendant never got a chance to contest the

---

1. The Court issued its original Order Addressing Pretrial Motions on March 9, 1998. On March 24, 1998, the Supreme Court handed down its decision in *Almendarez–Torres v. United States*, — U.S. ——, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). The Court has not amended the present order to take account of *Almendarez–Torres*.

2. The Court takes the following statement of facts from the parties' briefs. The Court expresses no view on the accuracy of those facts.

*merits* of the charge of deportability. The INS deported him on October 10, 1997.

That same day, Defendant attempted to reenter the United States, falsely claiming American citizenship. Border patrol agents questioned him and, becoming suspicious, checked his criminal and immigration records. After discovering that Defendant had been deported and had a criminal record, the agents allegedly read him his *Miranda* rights, which Defendant allegedly waived. Defendant then made incriminating statements.

On December 10, 1997 a federal grand jury returned a one-count indictment that charged Defendant with attempting to reenter the United States after being deported subsequent to a conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b)(2).[3] The indictment alleged that the aggravated felony was petty theft with a prior conviction.[4] Defendant pleaded not guilty.

### III. Discussion

Defendant has filed four pretrial motions that are now before the Court. First, Defendant asks the Court to dismiss the indictment. Second, Defendant moves the Court to suppress statements he made to the border patrol agents. Third, Defendant seeks additional discovery materials from the government. Fourth, Defendant seeks leave to file further motions. The government has asked for reciprocal discovery and fingerprint exemplars.

The Court will discuss each motion in turn.

### A. Defendant's Motion To Dismiss The Indictment

Defendant argues that the Court should dismiss the indictment for three reasons.

First, Defendant argues that his deportation violated his due process rights. Second, Defendant argues that the indictment fails to allege an aggravated felony. Third, Defendant argues that § 1326 is unconstitutional.

### 1. Whether The Court Should Dismiss The Indictment Because Defendant's Deportation Violated His Due Process Rights

■ Defendant first argues that the Court should dismiss the indictment because his deportation violated his due process rights. Specifically, Defendant argues that the INS failed to give him a hearing and failed to advise him of his right to appeal the deportation order.

■ In general, a defendant in a § 1326 prosecution may not attack the legality of the defendant's deportation. *See United States v. Villasenor-Cesar,* 114 F.3d 970, 972 n. 1 (9th Cir.1997) (holding that the lawfulness of the deportation is not an element of the offense); *United States v. Alvarado-Delgado,* 98 F.3d 492, 493 (9th Cir.1996) (same), *cert. denied,* — U.S. —, 117 S.Ct. 1096, 137 L.Ed.2d 228, *and cert. denied,* 117 S.Ct. 1097 (1997). Nevertheless, if and only if "the deportation proceeding was so procedurally flawed that it effectively eliminated the right of an alien to obtain judicial review," then the defendant may attack the deportation before trial and, if successful, preclude the government from relying on it. *Alvarado-Delgado,* 98 F.3d at 493; *see also* 8 U.S.C. § 1326(d) (providing that a defendant may not attack the validity of the deportation order unless the defendant was deprived of the right to judicial review of that order); *United States v. Mendoza-Lopez,* 481 U.S. 828, 839, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987) (holding

**3.** Section 1326 provides in pertinent part:
> (a) Subject to subsection (b) of this section, any alien who—
> (1) has been arrested and deported [or] has been excluded and deported ... and thereafter
> (2) ... attempts to enter ... the United States ... shall be fined under Title 18, or imprisoned not more than 2 years, or both.
> (b) Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—
> ....

> (2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 20 years, or both....

8 U.S.C. § 1326.

**4.** The "prior conviction" is presumably the battery conviction Defendant received on the same day he received the petty theft conviction. The parties have not discussed what the prior conviction was.

that the government may not rely on a deportation order if "defects in [the deportation] proceeding foreclose judicial review of that proceeding").

However, the Ninth Circuit has held that to challenge a deportation successfully, a defendant must do more than show that the defendant's rights were violated. Rather, "to challenge his prior deportation ..., [Defendant] must prove prejudice as a result of the error." *Alvarado–Delgado*, 98 F.3d at 493; *see also United States v. Leon–Leon*, 35 F.3d 1428, 1431–32 (9th Cir.1994).[5]

As discussed below, it appears that although the INS may have violated Defendant's right to contest the charge of deportability, the INS did not violate his right to appeal the deportation order. Moreover, even assuming that the INS violated his right to appeal, Defendant has failed to show prejudice.

### a. Whether The INS Deprived Defendant Of His Right To Appeal

Defendant argues that the INS violated his right to appeal the deportation order because it never informed him of his right to appeal. Defendant is mistaken.

The government has submitted a copy of a letter that the INS mailed to Defendant when it mailed him the deportation order. The letter advised Defendant of his right to appeal, and even enclosed the forms with which to do so. (*See* Pl.'s Supp.Br.Ex. A.) Thus, the INS did not fail to advise Defendant of his right to appeal. Defendant therefore cannot attack his deportation now. *See* 8 U.S.C. § 1326(d).

### b. Whether Defendant Has Shown Prejudice

Moreover, even assuming that the INS violated Defendant's right to appeal, Defen-

dant has not shown prejudice (an issue on which he bears the burden of proof). *See United States v. Zarate–Martinez*, 133 F.3d 1194, 1197 (9th Cir.1998). To show prejudice, Defendant must show " 'plausible grounds of relief which might have been available to him but for the deprivation of rights.' " *Id.* (quoting *Leon–Leon*, 35 F.3d at 1432).

Defendant argues that he suffered prejudice in two primary ways. First, Defendant claims that the INS improperly ordered him deported without a hearing, and that therefore the Board of Immigration Appeals ("BIA") would have vacated the deportation order. Defendant seems to argue that this fact, in and of itself, shows prejudice. Second, Defendant argues that if the BIA had vacated the deportation order and instructed the immigration judge to hold a deportation hearing, Defendant could have prevailed at that hearing.

The Court will address each of these arguments in turn.

### i. Whether The Fact That The Deportation Order May Have Been Vacated Establishes Prejudice

Defendant argues that the immigration judge committed reversible error by deporting him without a hearing. *See* 8 U.S.C. § 1252(b) (providing that "[d]etermination of deportability in any case shall be made only upon a record made in a proceeding ... at which the alien shall have reasonable opportunity to be present...."); *Leon–Leon*, 35 F.3d at 1431 n. 2 (holding that "an alien is entitled to be physically present at a deportation hearing").[6] Because the immigration judge may have erred, Defendant had plausi-

---

5. On April 24, 1996, Congress enacted subsection (d) of § 1326. Subsection (d) sets forth requirements that a defendant must comply with before the defendant can successfully attack a prior deportation. Subsection (d) does not explicitly require a showing of prejudice. Defendant argues that Congress therefore did not intend to require a showing of prejudice, and that cases decided before Congress enacted subsection (d) no longer have any force.

Unfortunately for Defendant, even after Congress enacted subsection (d), the Ninth Circuit has required a showing of prejudice. *See, e.g.,*

*United States v. Zarate–Martinez*, 133 F.3d 1194, 1197 (9th Cir.1998).

6. The government argues that Defendant was not entitled to a hearing because he abandoned his attempt to seek one. It appears, however, that at most Defendant abandoned his claim to discretionary relief. That does not mean that Defendant waived his right to contest the merits of the deportation charges. In any event, the Court will assume that Defendant should have had a hearing.

ble grounds to prevail on appeal. In a limited sense, therefore, Defendant has shown prejudice.

In a larger sense, however, Defendant has not shown prejudice from these facts. If Defendant had appealed the order, undoubtedly the BIA would have remanded the case with instructions to hold a deportation hearing. If Defendant could not have prevailed at the subsequent hearing, then the fact that he secured a reversal of the deportation order ultimately would not have helped him. *Cf. Leon–Leon*, 35 F.3d at 1431 (holding that prejudice does not exist if "the lack of a direct appeal only resulted in [the alien] leaving at a somewhat earlier time because he would have been deported anyway" (internal quotation marks and citation omitted)).

The question thus becomes whether Defendant has shown that he had plausible grounds to prevail at the hearing .that he never got. Defendant argues that he could have prevailed on three grounds. First, Defendant argues that he may have successfully contested the evidence against him. Second, Defendant argues that the immigration judge erred by concluding that he was deportable on the grounds that he had committed a crime of moral turpitude. Third, Defendant argues that even if he was not *entitled* to remain in the United States, he may have been able to receive discretionary relief from deportation.

The Court will address each of these arguments separately.

### ii. Whether Defendant Was Prejudiced By Not Being Able To Contest The Evidence Against Him

In support of its charge of deportability, the INS submitted documents that evidenced Defendant's criminal convictions. Defendant argues that because he never had his hearing, he never had a chance to contest the authenticity of these documents. Thus, Defendant argues, he was prejudiced.

This argument fails. Arguing that Defendant never had an opportunity to contest the evidence is the same as arguing that he never got a hearing. This says nothing about whether Defendant was *prejudiced* from not getting a hearing.

Defendant argues, however, that he is not "aware of" any evidence before the immigration judge that indicated that he was an alien. (Def.'s Supp.Mot. to Dismiss at 2.) This assertion does not show prejudice; at most it shows ignorance.

Defendant has never argued that he was not deportable as charged. Under these circumstances, Defendant has not shown prejudice.

### iii. Whether Petty Theft Is A Crime Of Moral Turpitude

Defendant next argues that the immigration judge may have erroneously determined that he was deportable because of a conviction for a crime of moral turpitude. In the deportation order, the immigration judge determined that petty theft is a crime of moral turpitude. (*See* Def.'s Supp.Mot.Ex. A at 3.) The Ninth Circuit, however, has never reached such a conclusion. *See Morales–Alvarado v. INS*, 655 F.2d 172, 174 n. 1 (9th Cir.1981) (noting that petty theft may or may not be a crime of moral turpitude). Thus, Defendant argues, the immigration judge's decision was erroneous, and Defendant may have successfully challenged it at the deportation hearing or on a subsequent appeal. Therefore, Defendant argues, he has shown prejudice.

This argument fails for one simple reason: Petty theft is a crime of moral turpitude. *See Soetarto v. INS*, 516 F.2d 778, 780 (7th Cir.1975) (noting that "[t]heft has always been held to involve moral turpitude, regardless of … the amount stolen"); *Ablett v. Brownell*, 240 F.2d 625, 630 & n. 11 (D.C.Cir. 1957) (collecting cases and holding that "petty theft … does involve moral turpitude within the meaning of the immigration laws").

### iv. Whether Defendant Could Have Received Discretionary Relief

Defendant next argues that even if the immigration judge had found him deportable, Defendant could have received discretionary relief from either the immigration judge or the BIA.

The problem with this argument is that Defendant had an opportunity to seek discre-

tionary relief, but he never filed his paperwork. Thus, Defendant procedurally defaulted on his request for discretionary relief, and therefore was not eligible for it. *See Matter of R–R–,* Int.Dec. 3182 (BIA 1992) (holding that the alien had abandoned his claim to relief from deportation because he had not filed paperwork on time).

Defendant argues, however, that before determining that he had procedurally defaulted, the immigration judge should have assessed whether Defendant had a good excuse. Defendant argues that had he "been given the opportunity . . ., he *may* have been able to establish reasonable cause and thereby persisted with a successful [claim to discretionary relief]." (Def.'s Supp.Mot. at 6 (emphasis added)).

Even assuming that the immigration judge should have inquired into the reason that Defendant did not file his paperwork,[7] Defendant still has not shown prejudice. Defendant merely asserts that he "may have" been able to establish reasonable cause. Defendant does not, however, assert that he had any grounds whatsoever on which to establish reasonable cause. Thus, Defendant has not shown prejudice.

In sum, Defendant has not shown prejudice from any deprivation of rights that may have occurred. Accordingly, the Court may not dismiss the indictment on those grounds.

### 2. Whether The Indictment Alleges An Aggravated Felony

Defendant next argues that the Court should dismiss the indictment because it does not allege a conviction for an aggravated felony. Defendant bases his argument on two grounds. First, Defendant argues that a typographical error alleges that Defendant violated a statute that does not criminalize any conduct. Second, Defendant argues that the conviction does not constitute an aggravated felony.

### a. Whether A Typographical Error Requires Dismissing The Indictment

■ The indictment alleges that Defendant was convicted of petty theft with a prior

offense, in violation of California Penal Code sections 684 and 666. Section 684, however, has nothing to do with criminal conduct. The indictment should have referenced section 484. Defendant argues that this error requires the Court to dismiss the indictment.

■ This argument has no merit. A purpose of indictments is "to inform[ ] the defendant [ ] of the crime charged with sufficient clarity to allow [him] to adequately defend against the charges. . . ." *United States v. Boone,* 951 F.2d 1526, 1542 (9th Cir.1991). An indictment is sufficient even if it references an incorrect statute, as long it does not prejudicially mislead the defendant. *See United States v. Lipkis,* 770 F.2d 1447, 1452 (9th Cir.1985). "Indeed, courts generally do not regard the statutory citation as *part* of the indictment." *Id.*

Defendant can hardly argue, and has not argued, that he was misled about the nature of the charges in this case. Thus, the Court will not dismiss the indictment because of a mere typographical error. Nevertheless, the Court urges the government to obtain an amended indictment that references the correct statute. *See United States v. Lim,* 984 F.2d 331, 337 (9th Cir.1993) (holding that a district court may permit the government to amend the indictment to correct an erroneous statutory citation), *cert. denied,* 508 U.S. 965, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993).

### b. Whether Defendant's Conviction Constitutes An Aggravated Felony

■ Defendant's next argument has more force. Defendant argues that a violation of section 484 does not constitute an aggravated felony within the meaning of the statute that defines aggravated felonies.

Defendant's argument has several steps. Defendant first notes that the Court must use a "categorical approach" when deciding whether a violation of section 484 constitutes an aggravated felony. *United States v. Lomas,* 30 F.3d 1191, 1193 (9th Cir.1994), *cert.*

---

**7.** This is a dubious proposition, as evidenced by the fact that Defendant does not cite any authority on point.

*denied,* 513 U.S. 1176, 115 S.Ct. 1158, 130 L.Ed.2d 1114 (1995). This means that the Court cannot consider the underlying circumstances of Defendant's crime, i.e., what he actually did. Rather, the Court must ask whether "the full range of conduct" prohibited by section 484 constitutes an aggravated felony. *Id.* Stated another way, the principle is this: If it is theoretically possible to violate section 484 without committing an aggravated felony, then a violation of section 484 cannot support a § 1326(b)(2) prosecution, regardless of what Defendant actually did to violate section 484.

Defendant next notes that 8 U.S.C. § 1101(a)(43)(G) provides that a "theft offense" is an aggravated felony. Defendant then points out that Congress did not define the phrase "theft offense." Defendant argues that "[w]here a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." *Moskal v. United States,* 498 U.S. 103, 114, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (internal quotation marks and citation omitted); *see also United States v. Capati,* 980 F.Supp. 1114, 1124–25 (S.D.Cal. 1997) (holding that when Congress uses a common-law term without defining it, a presumption exists that Congress intended to give it its common-law meaning); Justice Felix Frankfurter, *Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 537 (1947) (stating that "if a word is obviously transplanted from ... the common law ..., it brings the old soil with it"). Thus, Defendant argues, unless a violation of section 484 *necessarily* constitutes a common-law theft, it cannot constitute a "theft offense," and therefore cannot constitute an aggravated felony.

Section 484 provides:

Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall ... defraud any person of money, *labor* or real or personal property, or who causes or procures others to report falsely of his wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains

possession of money, or property or obtains the *labor or service* of another, is guilty of theft....

Cal.Pen.Code § 484(a) (emphasis added).

Defendant argues that, under common law, a misappropriation of labor did not constitute a theft. *See Chappell v. United States,* 270 F.2d 274, 276 (9th Cir.1959) (holding that theft "offenses were never thought to be committed by one man making use of the services of another's servant without reimbursing the master"). Therefore, Defendant argues, a violation of section 484 is not necessarily a "theft offense" and so the government may not rely on it to satisfy the "aggravated felony" element of § 1326(b)(2).

This argument fails because it does not take two factors into account: (1) The term "theft offense" is not necessarily a common-law term; and (2) even if it is, other, more relevant principles of statutory construction dictate that a violation of section 484 can support a prosecution under § 1326(b)(2). In addition, Defendant's argument ignores relevant case law.

### i. Whether The Phrase "Theft Offense" Is A Common–Law Term

Defendant argues that Congress used the common-law term "theft offense" without defining it. The more accurate observation, however, would be that Congress used the common-law word "theft" in the phrase "theft offense."

Notably, Congress did not define an aggravated felony as a "theft"—which would have been simple. Rather, Congress added the word "offense." If the term "theft" is coterminous with the phrase "theft offense," then the word "offense" is superfluous. Yet "[a] statute should be construed so as to avoid making any word superfluous." *United States v. Handy,* 761 F.2d 1279, 1280 (9th Cir.1985).

The question becomes, then, what the word "offense" adds to the term "theft." It certainly does not restrict or clarify the concept of theft, because all thefts are offenses. If the word "offense" does not restrict or clarify the word "theft," then it must broaden it. Thus, one most reasonably could read the statute as describing "an offense in the na-

ture of a theft." *Cf. United States v. Martinez–Vasquez,* No. CR–N–95–44–DWH, 1995 WL 918357, at *1–2 (D.Nev. Dec.4, 1995) (holding that mere possession of stolen property was a "theft offense").

Under this reading, the Court cannot find that a misappropriation of labor is so far removed from a misappropriation of goods that it is not "an offense in the nature of a theft." This analysis is confirmed by reference to section 484 itself, in which the California Legislature deemed a misappropriation of goods and a misappropriation of labor sufficiently similar to define them both as thefts.

In short, the Court is not convinced that Congress used a common-law term without modifying it. The linchpin of Defendant's argument therefore falls out, and his argument fails.

### ii. Principles Of Statutory Construction Reveal That A Violation Of Section 484 Always Constitutes An Aggravated Felony

Moreover, even assuming that the word "theft" and the term "theft offense" are coterminous, the Court does not agree that Congress intended to exclude misappropriations of labor from the definition of aggravated felonies.

■ Defendant's argument on this point hinges solely on the proposition that when Congress uses a common-law term, a presumption exists that Congress intended to give it its common-law meaning. However, this principle of statutory construction creates only a *presumption.* In this case, other principles of statutory construction clearly overcome the presumption.

■ Courts must not construe statutes in ways that reach absurd results. *See Brennan v. Southwest Airlines Co.,* No. 96–17053, 140 F.3d 849, 1998 WL 162163, at *3 n. 5 (9th Cir. Apr.9, 1998). Yet if the Court construed the term "theft offense" as strictly as Defendant asks it to, it would reach an absurd result.

Under Defendant's argument, a conviction under section 484 can *never* constitute an aggravated felony. Thus, Defendant asks

this Court to hold that California thieves are immune from § 1326(b)(2) prosecutions. Meanwhile, deported thieves in other states—states whose theft statutes do not include the words "labor" and "services"— could be prosecuted daily under § 1326(b)(2). This is beyond all reason. It is also clearly contrary to Congress' intent to make deported thieves nationwide subject to federal prosecution under § 1326(b)(2).

In short, Defendant's argument ignores two relevant principles of statutory construction—that courts must not construe statutes in ways that reach absurd results, and that courts should give effect to congressional intent. In the present case, these principles clearly overcome the presumption that Congress meant to restrict the term "theft offense" to the common-law meaning of the term "theft."

### iii. Case law

Defendant's argument also ignores case law that reinforces the Court's holding above. In *United States v. Lomas,* 30 F.3d 1191 (9th Cir.1994), the defendant was charged under § 1326(b)(2). The aggravated felony that the government alleged was cocaine trafficking, in violation of California Health and Safety Code section 11352(a). 8 U.S.C. § 1101(43) provides that "illicit trafficking in any controlled substance" is an aggravated felony.

California courts had held that one could violate section 11352(a) merely by transporting small amounts of drugs for personal use. Normally, transporting small quantities of personal drugs is not considered "illicit trafficking." The defendant argued that therefore it was possible to violate section 11352 without committing the aggravated felony of "illicit trafficking."

The Ninth Circuit rejected this argument. The Ninth Circuit stated:

> It certainly does not strain the definition of aggravated felony to suggest that section 11352(a) encompasses the category of conduct which Congress intended to include in its definition of "illicit trafficking." . . . Otherwise, all defendants convicted under section 11352(a), even those who sold large quantities of cocaine, would not be guilty of an aggravated felony. *Such a peculiar*

*result is hard to square with congressional intent.*

*Id.* at 1194 (emphasis added). This reasoning applies equally to the case at bar.

Accordingly, in light of the statutory language, principles of statutory construction, and case law, the Court holds that a violation of section 484 can establish the "aggravated felony" element of § 1326(b)(2).

### 3. Whether § 1326 Is Unconstitutional

■ Defendant next challenges the constitutionality of § 1326. Defendant argues that § 1326 impermissibly uses the result of a civil deportation proceeding to establish an element of the offense.

The primary authority Defendant relies on is Justice Rutledge's dissenting opinion in *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). In *Yakus,* the Supreme Court considered the constitutionality of the Emergency Price Control Act of 1942. The Act created the Office of Price Administration and gave the Price Administrator authority to promulgate regulations that imposed price controls on certain items.

The Act provided that any person affected by such a regulation could file an administrative protest. In the event that the protestor did not receive a favorable administrative ruling, the protestor could appeal to an Emergency Court of Appeals that consisted of district court and circuit court judges. The protestor also could petition for review in the Supreme Court. This procedure for attacking the validity of a regulation was exclusive; the Act provided that no other court could review a regulation's validity.

The criminal defendants in *Yakus* were charged with violating a price regulation. The defendants did not use the review procedures of the Act. Instead, they sought to attack the validity of the price regulation at trial, arguing that they had a due process right to do so.

The Supreme Court disagreed, holding that a person affected by the regulation must attack it by using the procedures the Act created. The Court stated:

> Unlike most penal statutes and regulations whose validity can be determined only by running the risk of violation, the present statute provides a mode of testing the validity of a regulation by an independent administrative proceeding. There is no constitutional requirement that that test be made in one tribunal rather than in another, so long as there is an opportunity to be heard and for *judicial review* .... And we are pointed to no principle of law or provision of the Constitution which precludes Congress from making criminal the violation of an administrative regulation, by one who has failed to avail himself of an adequate separate procedure for the adjudication of its validity, or which precludes the practice ... of splitting the trial for violations of an administrative regulation by committing the determination of the issue of its validity to the agency which created it, and the issue of violation to a court....

*Id.* 321 U.S. at 444, 64 S.Ct. 660 (citations omitted and emphasis added).

Thus, the Supreme Court held that the defendants did not have a right to attack the validity of the regulation at trial, as long as they could have attacked it before the administrative agency and then, if necessary, in court.

Justice Rutledge dissented. Justice Rutledge wrote:

> The fact is that if [a defendant] violates the regulation he must be convicted, in a trial in which either an earlier and summary civil determination or the complete absence of a determination forecloses him on a crucial ... question [of the regulation's validity]. In short, his trial for the crime is either in two parts in two courts or on only a portion of the issues material to guilt in one court.
>
> ....
>
> ... The effect is to segregate out of the trial proper issues ... relating to the validity of the law for violation of which the defendants are charged, and to leave to the criminal court only the determination of whether a violation of the regulation as written actually took place.... 

*Id.* at 478–80, 64 S.Ct. 660 (Rutledge, J., dissenting). Thus, Justice Rutledge would have held that criminal defendants have a

constitutional right to attack the validity of an administrative ruling during a subsequent criminal prosecution.

The similarity of *Yakus* to the present case is obvious. An element of the offense under § 1326 is that the defendant was deported, which is the result of an administrative ruling. However, the validity of the deportation is not subject to attack at trial. *See Alvarado–Delgado,* 98 F.3d at 493.

Defendant asks this Court to hold § 1326 unconstitutional by ignoring the Supreme Court's holding in *Yakus* and instead following the dissent. In support of this request, Defendant cites no authority that has overruled *Yakus*. Instead, Defendant cites *United States v. Mendoza–Lopez,* 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). In *Mendoza–Lopez,* the Supreme Court held that a defendant may attack a deportation order prior to trial if defects in the administrative proceeding foreclosed judicial review of that order.

In a footnote, however, the Supreme Court stated:

> Even with [the safeguard of pretrial attacks on deportation orders], the use of the result of an administrative proceeding to establish an element of a criminal offense is troubling. While the Court has permitted criminal conviction for violation of an administrative regulation where the validity of the regulation could not be challenged in the criminal proceeding [citing *Yakus* ], the decision in that case was motivated by the exigencies of wartime, dealt with the propriety of regulations rather that the legitimacy of an adjudicative procedure, and, *most significantly, turned on the fact that adequate judicial review of the validity of the regulation was available in another forum.* Under different circumstances, the propriety of using an administrative ruling in such a way remains open to question.

*Id.* at 481 U.S. 838 n. 15, 107 S.Ct. 2148 (emphasis added).

As this footnote makes clear, the decision in *Yakus* animated from many concerns. The most significant of these concerns was that review of the validity of the regulation was available: The person affected by the regulation could seek administrative review, followed by review in a special Article III court, and then, if necessary, in the Supreme Court.

Section 1326 provides for at least as much review: An alien can appeal to the BIA, and then to the United States Court of Appeals for the appropriate circuit. *See Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998) (noting that circuit courts have appellate jurisdiction over the decisions of the BIA). The alien can even seek review in the United States Supreme Court. If the alien was denied access to this appellate process, the alien can have judicial review of the deportation order in the district court prior to trial. *See Mendoza–Lopez,* 481 U.S. at 837–39, 107 S.Ct. 2148.

Given the process of review available to deportees, the Court cannot conclude that § 1326 is unconstitutional. Rather, it fully satisfies the requirements articulated in *Yakus* and *Mendoza–Lopez*. This Court is not at liberty to decline to follow *Yakus*. *See Insurance Group Comm. v. Denver & Rio Grande W. R.R.,* 329 U.S. 607, 612, 67 S.Ct. 583, 91 L.Ed. 547 (holding that "[w]hen matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court"); *United States v. Olmos–Esparza,* 974 F.Supp. 1311, 1317 (S.D.Cal.1997) (same). Section 1326 is constitutional. Defendant's motion to dismiss is denied.[8]

**B. Defendant's Motion To Suppress Statements**

Defendant also has filed a motion to suppress statements he made to the border

---

8. This Court previously has upheld the constitutionality of § 1326. This Court has upheld it against the argument that Congress does not have the authority to regulate our borders with criminal statutes. *See United States v. Hernandez–Guerrero,* 963 F.Supp. 933 (1997). The Court also has upheld § 1326 against an equal protection attack, finding that it rationally furthers a legitimate state interest. *See United States v. Pantoja–Valderama,* No. 97–2050–R, 1997 WL 856119, at *4 (S.D.Cal. Nov.24, 1997); *see also* James C. Rutten, Note, *Elasticity in Constitutional Standards of Review,* 70 S.Cal. L.Rev. 591, 594 (1997) (discussing rational basis review).

patrol agents. Defendant argues for suppression on two grounds. First, Defendant argues that the agents violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Second, Defendant claims that the agents did not tell him that he had a right to contact the Mexican consul.

The Court will rule on the *Miranda* motion after it holds an evidentiary hearing, which it will hold on the motion in limine date. The Court will address the second argument now.

The United States and the Republic of Mexico have signed the Vienna Convention on Consular Relations. *See* Vienna Convention on Consular Relations, Apr. 24, 1963, 115 Cong.Rec. 30,945, 596 U.N.T.S. 261 [hereinafter *Convention* ]. Article 36 of the Convention provides:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

. . . .

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested.... The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

*Convention* art. 36. The Convention "requires an arresting government to notify a foreign national who has been arrested ... of his right to contact his consul." *Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 487, 136 L.Ed.2d 380 (1996).

Defendant argues that his right to be informed of his right to contact the consul is analogous to his *Miranda* right to be informed of his right to contact an attorney. Defendant argues that just as a violation of *Miranda* requires suppressing statements, so too does a violation of the Convention.

Addressing this argument involves three distinct inquiries. First, the Court must determine whether Defendant has standing to challenge a violation of the Convention. Second, assuming the Court answers that question in the affirmative, the Court must decide whether Defendant must show prejudice. Third, if he must show prejudice, the Court must decide whether he has done so.

### 1. Whether Defendant Has Standing To Challenge A Violation Of The Convention

"Treaties are contracts between sovereigns." *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir.1996). Thus, only the signatory nations generally have standing to enforce a treaty. *See United States v. Rosenthal*, 793 F.2d 1214, 1232 (11th Cir.1986), *modified on other grounds*, 801 F.2d 378 (11th Cir.1986). An exception exists, however, if a treaty confers rights on individuals. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The question thus becomes whether the Convention confers individual rights.

This is a murky inquiry indeed. The language of the Convention states that law enforcement officials shall tell the arrestee of the arrestee's right to contact the consul. This seems to protect individual rights. However, the introductory sentence of article 36 indicates that this provision is not designed to benefit individuals, but rather seeks to "facilitat[e] the exercise of consular functions...." *Convention* art. 36.

Moreover, article 36 appears in a larger section of the Convention entitled "Facilities, Privileges, and Immunities Relating to Consular Posts, Career Consular Officers, and Other Members of a Consular Post." *Convention* Ch. 2, § 2. In addition, the preamble to the Convention states that it aims "not to benefit individuals but to ensure the efficient performance of functions by consular posts...." *Convention* pmbl. Thus, as one commentator has noted, "[a]rticle 36 ... is an awkward place to enumerate the rights of an individual national." Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: Search for the Right to Consul*, 18 Mich.J. Int'l L. 565, 593 (1997).

Nevertheless, three factors indicate that article 36 seeks to benefit individuals. First, the history of the Convention indicates that the drafters intended to create rights for individuals. *See generally id.* at 594–602

(discussing the drafting history). Second, some foreign nations and United States agencies have interpreted the Convention as protecting individual rights. *See generally id.*

Third, case law indicates that individuals can enforce the Convention. The Ninth Circuit has stated that the Convention benefits consular authorities *by means of* benefitting individuals. In *United States v. Calderon–Medina,* 591 F.2d 529 (9th Cir.1979), the Ninth Circuit considered whether a regulation that was promulgated to effectuate the Convention was designed to benefit individuals. In doing so, the Ninth Circuit considered whether article 36 was itself designed to protect individuals. The Ninth Circuit concluded: "[P]rotection of some interests of aliens as a class is a corollary to consular efficiency. This is evident because consular functions listed in article 5 of the Convention include 'helping and assisting nationals....'" *Id.* at 531 n. 5. Accordingly, the Ninth Circuit held that the regulation "serves a purpose of benefit to the alien." *Id.* at 531. However, the Ninth Circuit did not squarely hold that because of the incidental benefit the Convention confers on individuals, individuals have standing to enforce the Convention.

Nevertheless, several courts have allowed individual claims of violations of the Convention to proceed. *See, e.g., Breard v. Greene,* — U.S. —, —, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 1352, — (1998) (per curiam) (denying certiorari on a claim of a violation of the Convention without discussing the standing issue, but stating that the Convention "arguably confers on an individual the right to consular assistance following arrest"); *Villafuerte v. Stewart,* 142 F.3d 1124, No. 98–80303, 1998 WL 196241 (9th Cir. Apr.20, 1998) (entertaining a claim of a violation of the Convention without discussing the standing issue); *Faulder,* 81 F.3d at 520 (same); *Breard v. Netherland,* 949 F.Supp. 1255, 1263 (E.D.Va.1996) (same), *aff'd,* 134 F.3d 615 (4th Cir.1998), *cert. denied,* — U.S. —, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998); *Mami v. Van Zandt,* No. 89–CIV–0554 (TPG), 1989 WL 52308, at *1 (S.D.N.Y. May 9, 1989) (same); *see also* Kadish, *supra,* at 589–603 (arguing that the Convention confers

enforceable individual rights). *But see Paraguay v. Allen,* 949 F.Supp. 1269, 1274 (E.D.Va.1996) (suggesting that the Convention does not confer private enforceable rights), *aff'd,* 134 F.3d 622 (4th Cir.1998).

The Court need not definitively decide this muddled issue. As discussed below, the Court concludes that Defendant's motion fails because he must show prejudice, and has failed to do so.

### 2. Whether Defendant Must Show Prejudice

■ Defendant argues that he should not be required to show prejudice. Defendant notes that under *Miranda,* if law enforcement officials do not inform a defendant of the defendant's right to contact an attorney, then prejudice is presumed. Defendant seeks to extend this doctrine to the case at bar.

Case law on this issue is sparse indeed. Most of the cases that have even come close to addressing the issue have done so in the context of a deportation proceeding, in which the immigration judge failed to tell the potential deportee of his right to contact the consul for assistance during the proceedings. One of these cases, however, provides instruction.

In *Waldron v. INS,* 17 F.3d 511 (2d Cir. 1993), *cert. denied,* 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994), the immigration judge did not inform the alien of his right to contact the consul. This failure violated 8 C.F.R. § 242.2(g), which reiterates the requirements of the Convention by requiring the INS to inform deportees of their right to contact their consuls. The Second Circuit considered whether an alien must show prejudice from a violation of the regulation (and therefore the Convention). The court stated:

[N]either § 242.2(g) nor [an unrelated regulation] are regulations which implicate fundamental rights with constitutional or federal statutory origins.... Section 242.2(g) was adopted to ensure compliance with the Vienna Convention on Consular Relations.... Article 36 of the Convention provides, *inter alia,* that aliens shall have the freedom to communicate with consular authorities of their native country. Al-

though compliance with our treaty obligations is clearly required, *we decline to equate such a provision with fundamental rights, such as the right to counsel,* which traces its origins to concepts of due process.

*Waldron,* 17 F.3d at 518 (emphasis added). Accordingly, the Second Circuit held that an alien must show prejudice before the alien can secure a remedy for a violation of the Convention.

The Fifth Circuit has implicitly followed the Second Circuit's approach. In *Faulder,* law enforcement officials did not advise the defendant of his Convention rights. Without discussion, the Fifth Circuit required the defendant to show prejudice from that failure. *See Faulder,* 81 F.3d at 520.

The Court adopts the Fifth Circuit's approach and the Second Circuit's reasoning. The Court holds that a violation of the Convention does not rise to the level of a *Miranda* violation. Applying the presumption of prejudice mandated by *Miranda* is therefore inappropriate. The Court holds that, to have his statements suppressed, Defendant must show prejudice.[9] *See also Breard,* 949 F.Supp. at 1263 (holding that "a violation of rights under the Convention is insufficient to permit [habeas] relief"); *Mami,* 1989 WL 52308, at *1 (stating without analysis that a habeas petitioner's "general assertion [that the Convention was violated at the time of his arrest] does not indicate how any constitutional right was violated [and] gives no indication of what the ... diplomatic officials could have done for him, or how he was in any way prejudiced").

### 3. Whether Defendant Has Shown Prejudice

█ The Ninth Circuit has described the requisite showing of prejudice. In *United States v. Villa–Fabela,* 882 F.2d 434, 440 (9th Cir.1989), *overruled on other grounds by United States v. Proa–Tovar,* 975 F.2d 592, 594–95 (9th Cir.1992) (en banc), the alien argued that the INS had not informed him of his right to contact the consul for assistance during his deportation hearing. Pursuant to

a long line of cases holding that aliens must show prejudice from any deprivation of rights during deportation proceedings, the Ninth Circuit articulated the elements that the alien had to show. The Ninth Circuit stated: "To establish prejudice, the defendant must produce evidence that 1) he did not know of his right; 2) he would have availed himself of the right had he known of it; and 3) there was a likelihood that the contact [with the consul] would have resulted in assistance to him ...." *Id.* (internal quotation marks and citation omitted).

This reasoning applies equally to the case at bar. Under this test, Defendant has not established prejudice. Even assuming that Defendant did not know of his right, Defendant has not demonstrated—nor even alleged—that he would have contacted the consul if he had been informed of his right to do so. Of course, Defendant is *now* fully aware of his right but apparently still has not contacted the consul. Moreover, Defendant has not established, nor even alleged, that the consul would have done anything to help him and, if the consul had, it would have been anything that his attorney has not already done. *See Faulder,* 81 F.3d at 520 (finding no prejudice because "the evidence that would have been obtained by the [foreign] authorities is merely the same as or cumulative of evidence defense counsel had or could have obtained"); *cf. Breard,* — U.S. at —, 118 S.Ct. at 1355 (noting that the defendant could not "establish how the Consul would have advised him, [or] how the advice of his attorneys differed from the advice the Consul could have provided"); *United States v. Rangel–Gonzales,* 617 F.2d 529, 530–31 (9th Cir.1980) (finding prejudice from not being told of the right to contact consular authorities prior to deportation proceedings because the defendant had adduced evidence that he would have contacted them and they would have assisted him in finding an attorney).

Accordingly, the Court denies Defendant's motion to suppress statements insofar as it

---

9. The Court does not hold that suppression of statements is the proper remedy for a violation of the Convention. The Court merely holds that if suppression is the proper remedy, Defendant must show prejudice to secure that remedy.

rests on a violation of the Convention.[10]

**C. Defendant's Motion For Discovery**

The Court defers ruling on Defendant's motion for discovery until the hearing on the motions in limine.

**D. Defendant's Motion For Leave To File Further Motions**

Defendant's motion for leave to file further motions is denied without prejudice.

**E. The Government's Motions For Reciprocal Discovery And For Fingerprint Exemplars**

The Court grants the government's motions for reciprocal discovery and for fingerprint exemplars. Defendant shall make himself available for fingerprinting a reasonable amount of time before trial.

**IV. Conclusion**

For the reasons stated above, Defendant's motion to dismiss is denied. Defendant's motion to suppress is denied in part and deferred in part. Defendant's motion to compel discovery is deferred. Defendant's motion for leave to file further motions is denied without prejudice. The government's motions are granted.

IT IS SO ORDERED:

---

**10.** The Court does not downplay the government's violation of the Convention. In fact, the government's violation gravely troubles the Court, as it has other courts. *See, e.g., Faulder,* 81 F.3d at 520 (stating that the court "in no way approves of [the state's] failure to advise" the defendant of his Convention rights).

The United States should abide by its treaty obligations. As the Secretary of State has observed, if the United States fails to inform arrested aliens of their Convention rights, than other nations may not inform arrested American citizens of their right to contact the American consul. *See* Brooke A. Masters & Joan Biskupic, *Killer Executed Despite Pleas; World Tribunal, State Department had Urged Delay,* Wash.Post.,

Apr. 15, 1998 (discussing a letter written by the Secretary of State to the governor of Virginia urging him to stay the execution of a defendant whose Convention rights had been violated).

It appears that under international law, when a nation violates the Convention, "the only consequence is that apologies are presented by the government responsible...." *Case Concerning the Vienna Convention on Consular Relations* (Para.v.U.S.) (I.C.J.) (Order for Provisional Measures of Apr. 9, 1998). This is obviously insufficient. The Court does not foreclose the possibility that in an appropriate case, a violation of the Convention may warrant suppressing a defendant's statements or granting other appropriate relief.